CAMDENTON CONSOLIDATED SCHOOL DISTRICT No. 6 OF CAMDEN COUNTY, a Corporation, ex rel. W. H. POWELL LUMBER COMPANY, a Corporation, v. NEW YORK CASUALTY COMPANY, a Corporation, Appellant.—104 S. W. (2d) 319.

Division One, April 21, 1937.

*Bryan, Williams, Cave & McPheeters* for appellant.

*Gossett, Ellis, Dietrich & Tyler* for respondent.

FERGUSON, C.—In 1931 the Camdenton Consolidated School District No. 6 of Camden County (herein referred to as the School District) entered into a contract with Robert H. Dawson for the construction of a public school building. Dawson as principal and the defendant New York Casualty Company, a corporation, as surety, executed a contractor's bond to the Board of Education of the School District as obligee. The W. H. Powell Lumber Company, a corporation, sold and delivered to the contractor Dawson certain building materials which were used in and became a part of the new school building. The contractor failed to pay the Lumber Company's account for materials in full whereupon this action was brought on the contractor's bond, in the name of the School District, at the relation of the Lumber Company, for the balance alleged to be unpaid and owing to the Lumber Company on the account. A reference was ordered. The referee found for the Lumber Company on its account in the sum of $8338.35 and that in addition thereto plaintiff was "entitled to recover from the surety damages . . . for vexatious refusal to pay" in the sum of $833.83 and a "reasonable attorneys' fee" assessed at the sum of $800, making an aggregate amount of $9972.18. The circuit court overruled the exceptions of the New York Casualty Company to the Referee's report and entered judgment against it in the said aggregate amount of $9972.18, awarded by the Referee, from which judgment it brings this appeal.

A discussion of appellant's first and principal assignment hereafter stated, requires a statement of the facts of the situation giving rise to the bond sued upon. The School District had provided for the construction of a new public school building in the city or town of Camdenton according to plans and specifications therefor prepared and submitted to prospective bidders. Bids were received and Dawson being the successful bidder in the amount of $29,875, he to furnish all materials and labor, the Board of Education of said district awarded him the contract. A written contract was executed under date of July 27, 1931, whereby it was provided and agreed, that the contractor (Dawson) would "construct the school building according to the plans, specifications and general conditions hereto

attached for the total sum and price of $29,875" to be paid "in four equal payments" as therein specified. The specifications referred to and expressly made a part of the contract provided that the contractor "furnish bond covering the faithful performance of the contract and the payment of all obligations arising thereunder." The following statutory provisions relating to the provisions, conditions and effect of the bond which a contractor "for public work of any kind" should be required "to execute" were in full force and effect at the time. Section 2890, Revised Statutes 1929: "It is hereby made the duty of all officials, boards, commissions, commissioners, or agents of the state, or of any county, city, town, township, school, or road district in this state, in making contracts for public work of any kind to be performed for the state, county, town, township, school or road district to require every contractor for such work, to execute a bond to the state, county, city, town, township, school or road district, as the case may be, with good and sufficient sureties, and in an amount to be fixed by said officials, boards," etc., "and such bond, among other conditions shall be conditioned for the payment of material, lubricants, oil and gasoline used in or consumed in the construction of such work and for all labor performed in such work, whether by subcontractor or otherwise." Section 2891, Revised Statutes 1929: "Every person furnishing material or performing labor, either as an individual or as a subcontractor for any contractor, with the state, or any county, city, town, township, school or road district, where bond shall be executed as provided in Section 2890, shall have the right to sue on such bond in the name of the state, county, city, town, township, school or road district, for his use and benefit: . . . Provided, however, that sections 2890 and 2891 shall not be taken to in any way make the state, county, city, town, township, school or road district liable to such subcontractor, materialman or laborer to any greater extent than it was liable under the law as it stood before the adoption originally of said sections 2890 and 2891." The defendant New York Casualty Company is a corporation engaged in an insurance, surety and indemnity business for compensation or hire. Mr. Orson Curtis, an agent and representative of the New York Casualty Company, at St. Louis, went to Camdenton on "the day the bids were opened" and the contract awarded for the purpose of soliciting the successful bidder to purchase the necessary and required contractor's bond from that company. When the building contract was let to Dawson, Curtis took up with him the matter of furnishing the bond required by the Board of Education and provided for by the specifications, the compensation or premium therefor to be $448.18. Later Dawson agreed "to buy the bond" from the New York Casualty Company. This bond duly executed by Dawson as principal and the New York Casualty Company as

surety was proferred by Dawson and accepted by the Board of Education. Curtis testified that "the bond is a standard form of contractor's bond." It appears that the form of bond is that used to secure the performance of a building contract between a contractor and a private individual. The bond is in the amount of $29,875, the amount to be paid Dawson under the contract, and reads and is conditioned as follows: "Whereas, The Principal has entered into a written contract dated July 27th, 1931, with Obligee, for the construction of a two-story and basement school building, semi-fire-proof, brick and tile construction, a copy of which is hereto annexed.

"Now, Therefore, The condition of this obligation is such, that if the Principal shall indemnify the Obligee against any loss or damage directly arising by reason of the failure of the Principal to faithfully perform said contract, then this obligation shall be void; otherwise to remain in full force and effect." It will be noted that the conditions specified by Section 2890, supra, are not expressly set out.

Statutes similar to Sections 2890 and 2891, above set out, "have been adopted by a number of states, making it the duty of public officers, in certain cases, to require of contractors for public work bonds conditioned for the payment of the claims of laborers and materialmen. Most of such statutes require this provision in addition to the condition for the faithful performance of the contract and contemplate a single bond protecting both the public body and laborers and materialmen." [Annotation, 77 A. L. R., p. 140.] "The purpose and practical effect" of such statutes is to give laborers and materialmen "protection or security in lieu of or analogous to the mechanics' lien accorded in the case of a contract between private individuals." [Annotation 77 A. L. R., p. 141.] Under the law of this State a public building is not subject to liens under the Mechanics' Lien Statute and the bond required by Section 2890, supra, was manifestly intended by the Legislature to afford to those furnishing labor or material "on public work, which cannot be subjected to a mechanics' lien, the same measure of protection afforded by the mechanics' lien law where the building or improvement is not of a public character." [City of St. Louis to Use of Contracting & Supply Company v. Hill-O'Meara Construction Co., 175 Mo. App. 555, 158 S. W. 98; Hilton v. Universal Construction Co., 202 Mo. App. 672, 679, 216 S. W. 1034, 1036.]

Reverting to Section 2890, supra, it will be noted that the statute enjoins the Board of Education of the School District "in making" the contract for the construction of the public school building "to require" the "contractor for such work to execute a bond to the . . . school . . . district . . . with good and sufficient sureties, and in an amount to be fixed by said" Board "and such

bond, among other conditions shall be conditioned for the payment of material . . . used in or consumed in the construction of" the building "and for all labor performed in such work whether by subcontractor or otherwise." We think the statute contemplates a single bond containing the usual provisions securing the faithful performance of the contract and indemnifying the School District against loss or damage by reason of the failure of the contractor to so perform and in addition thereto specifically and expressly imposes as one condition "of such bond" ("among other conditions") that the contractor will pay for "material used" and "labor performed in such work." Pursuant to the statutory injunction the Board of Education did require that the contractor "execute a bond" and the contract provided, as and in the manner above stated, that he "furnish bond covering the faithful performance of the contract and the payment of all obligations arising thereunder," as the statute requires. The bond given, which it is evident was intended by all the parties to perform the office of the bond required by the statute and provided for by the contract, does not contain the statutory condition relating to and securing the payment by the contractor for material used and labor performed. In its literal wording the bond is conditioned merely to "indemnify" the school district "against any loss or damage directly arising by reason of the failure of the principal to faithfully perform" the contract.

Defendant, and appellant, Casualty Company takes the position, and this is the contention it relies upon to defeat the action, that the bond cannot be treated or considered as a statutory bond, that it is not conditioned either literally or substantially as required by the statute, that it is not even conditioned for the performance of the contract, but is only an indemnifying bond limited to securing the school district against pecuniary loss resulting from "failure of the" contractor "to faithfully perform" the contract, with no other obligation undertaken, and that the school district could suffer no pecuniary loss through failure of the contractor to pay for materials because no obligation rested on the school district to pay for materials. Appellant therefore says the Lumber Company, as relator, "has no right to sue on the bond" for the purchase price of materials sold to the contractor and used in the construction of the building. Appellant would disregard the situation, a school district, a public body, a public building contract, the terms of the contract itself in reference to the obligations of the bond required of the contractor, the provisions of the statute and object and purpose thereof, and the obligation imposed by the statute as to "such bond," and confine its obligation solely to that created by the literal wording or language of the bond, that is, appellant claims that regardless of the situation the liability imposed by the statute does not

arise unless the condition required by the statute is either, literally or in substance, inserted in the bond.

We may assume what obviously must have been true that the bonding company, engaged as it was and is in the business of writing surety and indemnity bonds for compensation, well knew the nature and extent of the obligation imposed by the statute in such cases and that in proposing and undertaking to write the contractor's bond had in contemplation, as did the contractor and the board of education of the school district, the character of bond and the obligations thereof required by the provisions of both the contract and the statute relating to "such bond." The situation requiring the bond, the contract, the bond, and the statute must all be taken into consideration in determining the extent of the bonding company's liability in a case such as this. The effect of the statute is to declare the liability in reference to material and labor used in public work, of one executing the bond therein required. "The law will not compel one to enter into a contract but in a proper case it may fix the liability of one who does voluntarily contract." [Globe Indemnity Co. v. Barnes (Tex. Com. App.), 288 S. W. 121.] In the case cited the Texas Court of Civil Appeals (Seventh Supreme Judicial District) makes this observation: "That the Legislature did intend liability to exist in favor of those furnishing material or labor to the contractor, whether the bond expressly so agrees or not, is manifest by the authority conferred on such persons to sue the bondsmen. It is only where there is no express contractual liability that such portion of the statute could have any force or be needed. Where the bond so stipulates, such parties have their cause of action without the statute. It is contractual." The bonding company must be held to have known the requirements of the statute and the obligation imposed as to "such bond" and its "executing as surety . . . evidences assent to be bound according to the liability prescribed by the statute." By executing the bond, under the circumstances existing in this case and in view of the provisions of the statute and the contract, appellant "necessarily" assented "that the terms of the statute become a part of" the obligation (Globe Indemnity Co. v. Barnes, supra) and the statute must therefore be read into the bond.

There is a conflict of authority on the question, at issue here, "whether a condition prescribed by statute for the benefit of laborers and materialmen will be read into and treated as part of" the bond, of a contractor for public work, "from which it is omitted, where the bond does not expressly exclude the condition." [Annotation, 77 A. L. R., p. 152.] Before discussing the decision of this court in Fogarty v. Davis, 305 Mo. 288, 264 S. W. 879, relied upon by relator as being decisive of the issue in this jurisdiction but which appellant contends is not applicable to the facts of the present

case, we shall refer to certain decisions in other jurisdictions which we think reach a correct result in holding the bonding or surety company liable upon bonds executed in a situation similar to that existing in the instant case. The language of the West Virginia statute is very similar to ours. In Tug River Lumber Co. v. Smithey et al., 107 W. Va. 482, 148 S. E. 850, Smithey entered into a contract with the board of education for the construction of a public school building. The contract provided that the contractor give merely an indemnifying bond. The bond was executed with a corporate surety company as surety. As does the bond in the present case it refers in a general way to the contract, "a copy of which is hereto annexed," and then states the sole condition in the identical language of the bond involved in this action. The Tug River Lumber Company and others brought the action on the bond seeking to recover against the surety company for material used and labor performed in the construction of the building. The surety company contended that the bond was not given pursuant to the statute and was a mere indemnifying bond "for the sole protection and benefit of the board of education." From the judgment in the circuit court in favor of the plaintiff the Surety Company appealed. The following excerpts are from the opinion of the Supreme Court of West Virginia: "What were the circumstances under which the bond was given? It was executed by the contractor pursuant to an agreement in his contract with the board. . . . The Board of Education is a statutory body. By the plain mandate of the statute . . . the board is enjoined in such case to require a . . . bond to be executed . . . to cover cost of material used and labor employed in the construction of such public building. The patent reason for such bond is that the lien imposed by law to secure payment for such furnishings does not attach to public structures. The surety company was requested to furnish a bond . . . under the circumstances, and was it not bound to know the nature of the condition it would become liable upon if broken. . . . It is axiomatic that the contract by specific reference in the body of the bond becomes a part of the bond. The specifications, made specifically a part of the contract, require the contractor to satisfy the claims of mechanics and materialmen." So in the instant case the contract requires the contractor to "furnish all the materials and perform all the work" and to "furnish bond covering the faithful performance of the contract and the payment of all obligations arising thereunder." Continuing the quotation, the opinion of the Supreme Court of West Virginia holds, that "the surety company was charged by all the circumstances surrounding the transaction with the character of indemnity required," and that the bond should be treated as a statutory bond and as the statute fixed "what its obligation shall be" it "is a part of the bond as effectually as if

such obligation were in words inserted in it.'' The opinion then concludes with this summation: ''Conceding that there is no right of lien against the school building, this bond, if only for the protection of the board, and not for the protection of laborers and materialmen, would be meaningless. . . . It is a public bond, and the indemnity company insuring for profit must be held to have known that the law required such a bond, and that it had a certain legal force. The law made the instrument in this case necessary, and the parties are deemed to have had the law in contemplation when the contract was executed, and bound themselves in reference thereto.'' A like ruling on the West Virginia statute and a bond very similar to the one involved in the instant case was made by the Federal Circuit Court of Appeals of the Fourth Circuit in Hartford Accident & Indemnity Co. v. Board of Education, 15 Fed. (2d) 317. In Wisconsin the statute in reference to contracts of a public body for public work provided that all such contracts ''shall contain a provision for the payment by the contractor of all claims for such work and labor performed and materials furnished'' and also required that the contractor give a bond ''conditioned for the faithful performance of the contract'' and ''the payment . . . of all the claims for work or labor performed, and materials furnished . . . under such contract.'' The City of West Allis entered into a contract for the construction of an addition to a public school building. The contract did not contain the statutory provision obligating the contractor to pay for material and labor entering into the construction of the building and the contractor's bond merely guaranteed the faithful performance of the contract, the statutory provisions being omitted. In determining the liability of the surety on claims for material and labor entering into the construction of the building the Supreme Court of Wisconsin, in Baumann v. City of West Allis and London & Lancashire Indemnity Co., 187 Wis. 506, 524, 204 N. W. 907, 914, observed, that, under the existing circumstances, if liability for such claims ''be laid upon either the contractor or surety, it must be by virtue of law. . . . Obviously, this statute was enacted for the purpose of protecting subcontractors furnishing labor and material entering into the construction of public buildings which are not subject to a lien as are buildings owned by private individuals. It was said in Webb v. Freng, 181 Wis. 39, 44, 194 N. W. 155, that: 'When that statute was enacted the Legislature was doubtless familiar with the fact that, through the insolvency or mismanagement of contractors, materialmen had often suffered heavy losses. In view of the fact that they could not file liens against municipalities, the Legislature sought by enacting this statute to afford relief in such cases.' This is a remedial statute and will be construed most liberally to suppress the mischief and advance the remedy. (Citing cases.)

"It will be noticed that the literal wording of the statute merely requires the insertion of the provision in all contracts for the construction of public works. It is the contention of appellants that the liability sought to be imposed by the statute does not arise unless the provision required by the statute is actually inserted in the contract. If this construction is correct, then the relief which the Legislature attempted to afford subcontractors and materialmen. is very much like sounding brass. The remedy which the Legislature intended to extend may, under such a construction be defeated if the parties to the contract do not insert the prescribed provision, and whether the remedy is available to subcontractors and materialmen depends, not upon the law, but upon the parties to the contract. If this be the proper construction of the law, then the statute might just as well not have been passed, because such was the law before. Such a statute will be construed in the light of the conditions and circumstances which gave rise to the law and to effectuate the purpose which the Legislature sought to accomplish. Having discovered that purpose, the law should be construed to give effect thereto. We entertain no doubt that it was the purpose of the Legislature to afford a remedy, in the nature of an action against the surety, to all subcontractors furnishing labor or material entering into the construction of public buildings and public works mentioned in the section of the statutes. This purpose may not be defeated by the voluntary act or by the oversight of the parties in failing to insert such a provision in the contract. The law imputes such provision to the contract whether written therein or not. The liability is one arising by virtue of the law independent of the contract." The following cases subscribe to the rule announced in the cases cited and reviewed. [Union Indemnity Co. v. Acme Blow Pipe & Sheet Metal Works, 150 Miss. 332, 117 So. 251; Commercial Bank of Magee v. Evans, 145 Miss. 643, 112 So. 482; Detroit Fidelity & Surety Co. v. Yaffee Iron & Metal Co., 184 Ark. 1095, 44 S. W. (2d) 1085; Nye-Schneider-Fowler Co. v. Roeser et al., 103 Neb. 614, 173 N. W. 605.]

We come now to the decision of this court in Fogarty v. Davis to which reference has been heretofore made. The Cabool School District entered into a contract with one Mann to furnish and install a heating plant in a public school building "in the course of construction for the district." Thereafter Fogarty and others composing a partnership, by subcontract, agreed with Mann that they would furnish and install the plumbing and heating plant. Mann became insolvent and failed to pay the subcontractors for labor performed and material furnished and used in the installation of the heating plant. Mann's bond was executed by the United States Fidelity & Guaranty Company, as surety. It was conditioned "that Mann perform all his contract obligations and keep the obligee"

(the school district) "harmless and indemnified from and against all and every claim, demand, judgment, lien, cost and fee . . . and repay said obligee all sums of money said obligee may pay to other persons on account of work and labor done or materials furnished on said contract." The condition relative to labor and materials prescribed by statute was not expressly included in the bond. On the theory that since the bond did not comply with the statute they could not recover thereon against the surety, Fogarty and partners brought this action against the board of directors of the school district, seeking to recover the amount of their unpaid account for labor and material, alleging that the directors were personally liable on account of their failure or neglect to take a bond conditioned as prescribed by the statute. Though the bond did not contain such condition this court declared it to be a statutory bond and that the surety was liable under the statute to materialmen and laborers and held that therefore "there was no actionable neglect" on the part of the school directors "which renders them liable." In distinguishing the Fogarty case appellant cites Southern Surety Co. v. United States Cast Iron Pipe & Foundry Co., 13 Fed. (2d) 833, an opinion by the Federal Circuit Court of Appeals of the Eighth Circuit in a suit in equity to reform a contractor's bond and recover on a claim for material furnished the contractor in the construction of a city waterworks system for King City, Missouri. The District Court reformed the bond by inserting the statutory condition therein and then gave judgment in favor of the materialmen against the Surety Company thereon. The sole condition of the bond was to indemnify the city against "pecuniary loss resulting from the breach" of the contract on the part of the contractor. The Circuit Court of Appeals held that the bond was not a statutory bond, denied reformation and reversed the decree of the lower court with directions to enter judgment in favor of the surety company. The Circuit Court of Appeals predicates its decision on the proposition that "a statutory bond is one that (by the terms written into the bond) either literally or substantially meets the requirements of the statute" and that the bond involved "was not so conditioned, either literally or substantially" as prescribed by the statute. The opinion then discussed Fogarty v. Davis and the view of that case there taken is advanced by appellant in the present case. The Circuit Court of Appeals' opinion first points out that the contract in the Fogarty case provided that the "contractor shall . . . provide all materials and perform all the work," etc., and observes: "That provision of the contract required the contractor both to furnish and pay for the labor and material." One of the conditions of the bond is then noted, "that the contractor should perform all his contract obligations." The opinion then says: "Since the bond was conditioned for the performance of the contract, and the con-

tract obligated the contractor to furnish and pay for the materials, the bond, though not in form, was, in substance, what the statute required.'' Under the facts in the Fogarty case the reasoning of the Circuit Court of Appeals and its conclusion might well and soundly have been made the basis of the decision therein. The writer is, however, inclined to the opinion that the decision in that case was not predicated upon that theory. Reverting now to the opinion of this court in the Fogarty case. After stating the facts of the situation, the terms of the contract and conditions of the bond, as heretofore set out, the opinion observes that the ''bond is in form appropriate for use to secure the performance of a building contract between a contractor and a private individual'' (as in the present case) with the school district as obligee and then states: ''It is not and could not well be contended that the purpose of the parties was other than to give a bond under the statute. . . . The use of the wrong printed form seems to have been an inadvertence.'' The opinion then proceeds to treat the bond as a statutory bond and says: ''The rule in this State is that in construing a statutory bond the provisions of the statutes must be read into it and construed as a part of it. 'When parties execute a statutory bond they are chargeable with notice of all the provisions of the statute relating to their obligation, and those provisions are to be read into the bond.' '' (Citing cases.) Here follow a number of quotations from Missouri cases supporting the rule as to statutory bonds announced, the quotations (authorities cited) concluding: ''The general rule is that, where a contract of suretyship is entered into pursuant to a statute . . . the statute . . . forms a part of the contract. *If the law has made the instrument necessary, the parties are deemed to have had the law in contemplation when the contract was executed.*'' (Italics ours.) The conclusion is then stated as follows: ''It is obvious the parties were acting under the statute, and it is clear there was no other legal obligation resting upon them which called for a bond of any kind. The cited rule is applicable, and the bond given, when construed in its light, gives appellants an action upon it. It results that there was no actionable neglect on the part of respondents which renders them liable to appellants.'' Thus the case is ruled, and as the writer views the decision, on the theory that in the situation the statute made a bond necessary and the parties are therefore deemed to have acted under the statute or in reference thereto when the bond was executed making it a statutory bond and the rule that statutory provisions relating to the obligation of such a bond will be read into the bond and considered as a part of it applicable. Having ruled the case the opinion does, however, continue in an additional paragraph in which it is said: ''There is persuasive authority for the view that, in circumstances like those in this case, a contract to provide

or furnish labor and materials is a contract to provide them at the 'proper cost, charge and expense' of the contractor'' (citing an Indiana case and a Kentucky case). Then follows an excerpt from the opinion of the Federal Circuit Court of Appeals in American Bonding Co. v. Pueblo Inv. Co., 150 Fed. 17, ''which . . . discussed the question.'' This paragraph then concludes, ''In view of our statute and the attempt to comply with it, that suggestion has force in the construction of the contract in this case. When the contract is thus construed, then the subcontractors have a right of action on the bond in this case for this reason also.''

Returning to the case under decision we have a contract with the Board of Education, a statutory body, representing the public school district, for the construction of a public school building. The statute enjoins the board to take ''a bond'' from the contractor and imposes among other conditions of ''such bond'' an obligation to pay for labor performed and material used in such construction work, this provision being for the protection of laborers and materialmen. The Board of Education did require that the contractor give a bond. The corporate surety with knowledge of the condition and obligation relating to labor and material imposed by the statute and provided for by the contract executed the contractor's bond under these circumstances which make the statutory bond necessary and though the bond, in the form used and as executed, did not contain the statutory obligation relating to labor and material (such obligation was not expressly excluded) it must be treated and considered as a statutory bond and the statutory obligation read into it. We hold therefore that appellant, under and by virtue of the statute, is liable as surety on the bond to materialmen and laborers on their properly established claims.

The contractor did not complete the building. It is not clear, nor is necessary to a decision of the assignments made here to determine, at just what stage of the construction the contractor made default—apparently however the building was well advanced in construction. At the time of default and of trial of the cause the contractor was insolvent. Relator's evidence shows and the referee so found that all the materials furnished by the relator Powell Company making up the material account allowed by the referee were used in the construction of the building and went into and became a part thereof. Dawson, the contractor, was without operating capital but wishing to bid on the contract sought financial assistance to guarantee the pay of laborers. He testified: ''I had a conversation with W. H. Powell (of the Lumber Company) in regard to bidding on the school house. I believed that I could get the contract if I could get financial backing. He told me to go ahead and bid on the school house and he would take care of my pay roll.'' The evidence further was that it was agreed that the contractor

would repay advancements for the labor pay roll made by Powell or rather the Powell Lumber Company, for which Powell was acting, out of the payments made to him by the school district on the contract. Pursuant to this arrangement the Powell Company advanced cash from time to time to the contractor, with which he met the labor pay roll, keeping a separate account thereof on its books. It also advanced the sum of $448.14 with which the contractor paid the surety company for the bond herein. The evidence shows and the referee found, and this appears to be undisputed, that the Powell Company advanced in cash $4593.94 to the contractor to meet labor pay rolls and that the money was actually paid out for that purpose in payment of proper charges or wages for labor in the construction of the building. The contractor received one payment under the contract in the amount of $7468.75, out of which he paid the Powell Company the sum of $5148.60. The Powell Company's total of cash advancements, for labor pay rolls and the premium on the bond, was $5042.08. The Powell Company applied this payment of $5148.60 to the payment of this cash account in full and credited the remainder or $106.52 on the material account. However, the referee did not allow the credit on the cash account for the amount of the bond premium but held the Powell Company was entitled, under the circumstances, to credit the cash account in the amount of $4593.94 advanced and actually paid out for labor charges, as above recited, and to recover against the surety company for the balance remaining due and unpaid on the material account after the proper credits thereon were allowed, which finding was approved by the Court and judgment entered accordingly. It is undisputed that the remainder of the $7468.75 payment made by the school district, that is $2320.15, went to pay and discharge other labor claims, $1400 of the amount for ''bricklaying'' and ''the rest was checked out for miscellaneous labor on the school building.''

As the writer understands, appellant's position on this phase of the case is that though it be held liable as surety for the payment of labor performed and material used in the construction of the building and though money advanced to the contractor by the Powell Company was advanced for the purpose and actually paid out for labor and wages which if not paid appellant would be liable for nevertheless the total sum so advanced by the Powell Company and paid out for labor should be considered and treated merely as a loan to the contractor and a debt of the contractor to the Powell Company without regard to how or for what purpose it was advanced and used; that the Powell Company knew that the payment made to it, and out of which it discharged its account for cash advanced to pay labor accounts, was money paid to the contractor under and by virtue of the contract and was therefore a fund which appellant as surety had an equitable right to have ap-

plied to the extinguishment of its liability; but that the Powell Company applied it on another debt, that is the debt of the contractor to it for money loaned to him; and that it (appellant) is equitably entitled to have credit on the material account in the full amount of the payment so made to Powell Company by the contractor, its principal. If this contention be allowed appellant would be relieved of liability in that amount for labor and also escape liability in the same amount for material. We are inclined to the opinion that under the facts of this case it is, in effect, immaterial to which account the payment was credited since it is shown, and the referee's finding is conclusive thereof, that the cash advanced (except that paid out for premium on bond) was used solely to pay for labor performed in the construction of this building and for no other purpose and that all the material charged on the material account allowed by the referee was furnished for and used in this building and appellant surety was liable for both labor and material accounts. In this connection School District No. 18 of Caruthersville v. McClure and the Southern Surety Company (Mo.), 224 S. W. 831, seems *apropos*. The School District contracted with McClure "to build for it" a public school building. The Surety Company executed the contractor's bond. The contract provided that McClure was "to furnish all material and labor for such structure." The contractor defaulted and the school district was compelled to take over and finish the building and in doing so paid certain charges in an aggregate of $11,712 more than the contract price. The school district brought an action on the bond. As to one item involved in the case, "a payment of $800 to a certain bank," this court said: "George McClure, the man in charge of the work for defendant McClure, was short of funds with which to meet his pay rolls for two successive weeks and borrowed (from a bank) $800 in all with which to meet such pay rolls. He gave the bank an order for the amount to be taken out of the next payment to the contractor. This order was upon the school board of respondent school district. The evidence tends to show that this money (borrowed from the bank) was used to pay for labor done on this school building. It was gotten for that purpose and whilst notes were given with the order aforesaid as collateral, we are inclined to the view that this item . . . was properly chargeable to the bond in suit. The money was actually paid for labor done upon the school building." Crane Company v. Pacific Heat & Power Co., 36 Wash. 95, 78 Pac. 460, is fairly illustrative of the cases cited and relied upon by appellant in support of its contention that it, as surety, was equitably entitled to have the whole of the payment made by its principal to the Powell Company credited upon the material account. The facts set out therein are such as clearly invoke the application of the equitable principle which appellant advances

here but under the facts of the instant case, and in so far as the equities are concerned, the equity of the Powell Company in the funds paid to it out of the payment to the contractor on the contract was superior to that of the surety. [Hartford Accident & Indemnity Co. v. Federal Construction Co., 168 Minn. 202, 209 N. W. 911; New Amsterdam Casualty Co. v. Wurtz, 145 Minn. 438, 177 N. W. 664; Ganley v. City of Pipestone, 154 Minn. 193, 191 N. W. 738.] The assignment is ruled against appellant.

█ The appellant next contends that should the bond be held to be a statutory bond and that it is liable thereon for materials used in the construction of the building that the charge made by Powell Company, and allowed by the referee, for structural steel was unreasonable and grossly excessive and should be substantially reduced. There is apparently no dispute as to the quantity or quality of structural steel sold by the Powell Company to Dawson or that all such material listed in the account was delivered to Dawson and went into the building. Appellant says, that the Powell Company pleaded that its charges for materials were reasonable at the time and place, that no substantial evidence was offered by the Powell Company that the prices charged therefor were reasonable, and that the evidence on the part of appellant shows same to be unreasonable and excessive. The Powell Company charged $2206.60, for the structural steel. Relator's evidence as to this item was in substance as follows. At the time the Powell Company seems to have bought structural steel to meet its various contracts for that type of material from the Banner Iron Works in St. Louis, and placed a number of orders for structural steel with that company during the year 1931 for various building contracts on which the company was furnishing material. Stanley Hall, manager of the Powell Company business at Camdenton testified that he had an engineer "connected with" the Banner Iron Works "to figure out the steel on the building and he made me a price and I in turn made Mr. Dawson a price." The price to Dawson included the dealer's profit. Hall had been engaged in the building material business for twelve years and said, based on his experience, he considered the prices charged Dawson for the materials reasonable. W. H. Powell had been in the building material business for twenty-eight years. He testified that in selling the structural steel for this building the company made Dawson a "lump price" arrived at by adding the customary percentage of dealer's profit for that kind of material to the price at which the Banner Iron Works sold it to the Powell Company, that Dawson contracted to buy the steel at the price offered, and that the prices charged for the steel were reasonable at the time and place and under the circumstances. C. G. Scruggs had been engaged in the building material business at Jefferson City for twenty-eight years. He testified that he sold "everything for buildings"—

"anything that went into a building;" that he was familiar with the price of building materials, customary profit percentages and conditions generally appertaining to the building material business in that section of the State including the town of Camdenton; that he had examined the entire account for materials; that "practically all the steel was fabricated," that is "fabricated for the particular job and couldn't be used on any other job without loss" and "extra expense;" that "fabricated steel costs more than ordinary steel;" that it is customary in that section for materialmen in selling materials for a building "to get the larger part of their profit out of fabricated material and a very small and inadequate profit out of standard items," detailing the reasons and basis for such practice among the trade and the necessity therefor due to the risk and responsibility undertaken by the materialman on fabricated material; and that "based upon" his experience he considered the Powell Company price on structural steel "very reasonable." We cannot agree with appellant's argument that the cross-examination of this witness disqualifies the witness and destroys the value of his testimony as to the reasonableness of the price of steel. On cross-examination he stated that while "at the present time" he did not remember the market price in St. Louis, in the summer of 1931, "of the kind of steel used in this building," he added that his testimony was not "a guess" but that he took into consideration the size of the building, the quantity and kind (practically all fabricated) steel used and the price charged. We hardly think the reasonableness of the retail dealers charge under the particular circumstances, the conditions of the sale, time, place, kind of steel, and customary percentage of profit, would be concluded by the market price in St. Louis on plain or ordinary steel and it nowhere appears in the record that there was a market price on fabricated steel such as composed, according to the witness, "practically all the steel" used; apparently the price of such material depended upon the particular order. On this issue appellant, as defendant, offered the following evidence. Witness Ernst, who stated he was a salesman for the Inland Steel Company of Chicago, testified, that he had examined the items of structural steel used in the building, as listed in the exhibit, and that "about four-fifths is fabricated steel;" that "I am not in a position to qualify on fabricated steel;" that "I am able to state what the fair reasonable market value of the price on plain steel is at the St. Louis fabrication plant;" and that "the figures on the plain material delivered in St. Louis would be approximately $600." We are not called upon to interpret, weigh or evaluate the evidence but if we were the writer would be at a loss to determine the purpose or meaning of this testimony. Does the witness mean that the market value of the one-fifth of the steel which he says was "plain steel" delivered at the fabrication plant in St. Louis would

have been $600 or does he mean that would have been such market value of plain steel of equal weight of the whole amount before fabrication? Defendant also produced as a witness one Bradshaw who testified that he was employed in the purchasing department of the St. Louis Structural Steel Company; that "steel specially fabricated is not sold with a tight market value that anybody can read in the paper but varies a good deal in price;" that of the steel used in this building, in his opinion, about half was fabricated and half was plain steel; and that "our figure on this bill of materials would be approximately $1,015," evidently undertaking to say that on the basis of one-half only being fabricated (though defendant's witness Ernst had estimated four-fifths as fabricated and witness Scruggs "practically all") had the Powell Company in 1931 dealt with his company instead of a competitor he would have sold it the material for $1015. He does not say what the price would have been on the basis of four-fifths or more being fabricated and adds that the credit of the person to whom he sold would have to be established and that if sold to a building material merchant he would expect the merchant to make a profit. So much, and perhaps too much detail, concerning the evidence on this issue but appellant has argued at length and so stressed its contention that there was no substantial evidence to sustain the referee's finding against it thereon and that its evidence shows the price for steel to be grossly excessive that we have been constrained to review the matter in a rather detail way. We think it will suffice now to observe that treating the evidence offered by defendant as competent, without ruling, nevertheless in our opinion relator offered substantial evidence tending to establish the reasonableness of the price charged for the structural steel and that the issue was one of fact resolved by the finding of the referee.

The "mill work" for the building, "that is window frames, windows, doors, transoms, the inside trim," etc., was computed and listed and the Powell Company offered to furnish all the "mill work" required by the plans and specifications at stated prices and a written agreement was entered into between the Powell Company and the contractor whereby the contractor purchased and the Powell Company agreed to furnish all the required mill work at the prices stated. All the "mill work for a job of the character of this school house is special and has to be made up for that particular job." The Powell Company had the mill work "made up" and all of that item charged in the material account, as allowed by the referee, was delivered and went into the building and no question is made as to the reasonableness of the charges therefor. Appellant claims however that there is evidence that some portion of the mill work had not been delivered at the time Dawson was discharged from the work. There is some evidence indicating that the mill work charged for, and which indisputably went into the building, was delivered to and

receipted for by Dawson. It is not clear to the writer under just what arrangement the building was completed following the discharge of Dawson but the very evidence upon which appellant, in this connection, relies, indicates that such of the mill work included in the material account, as allowed, that had not been delivered was at the time already made up pursuant to the contract with Dawson therefor and there is evidence on the part of relator tending to show that appellant's agents and representatives ordered and directed that it be delivered to Dawson's successor. All the mill work which went into the building was furnished by the Powell Company under and pursuant to the contract with Dawson therefor and in conformity to his contract with the district and the plans and specifications therein. The referee and trial court found against this contention made by defendant surety and we perceive no reason to disturb that finding. Appellant complains that it is charged with one invoice of shiplap in the amount of $68.10 which was not delivered to or used in the construction of this school building but was instead delivered to a church building which contractor Dawson had under construction at the same time. The referee found against appellant's contention and there is substantial evidence to support the finding that the protested item was delivered to the school building and used in the construction thereof and was properly chargeable against appellant.

Appellant's final assignment is, that "considering the character of the bond in this case and all the facts the assessment of damages and attorney's fees as for a vexatious delay was erroneous." In this connection appellant first says: "It is doubtful that the statute authorizing the assessment of penalties as for vexatious delay applies." The statute, Section 5929, Revised Statutes 1929, reads: "In any action against any insurance company to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict." The business carried on by this surety company "is in all essential particulars" that of insurance and the bond "was in every sense a contract of insurance on the conditions" thereof. [Fidelity & Deposit Co. of Maryland v. John Gill & Sons Co. (Mo.), 270 S. W. 700.] A discussion of this statute will be found in State ex rel. Elberta Peach & Land Co. v. Chicago Bonding & Surety Co., 279 Mo. 535, 552, 215 S. W. 20, 25, and it is there held that a corporation licensed and doing a bonding business of this kind for profit, as is

appellant, is an insurance company, and a bond which such company executes as surety is a contract of insurance, within the meaning of the statute. The opinion in that case says: "In fact, the contract of suretyship is inherently that of insurance. The surety is an insurer of the debt, the fidelity, or the undertaking of his principal (Pingrey on Suretyship and Guaranty, sec. 2), and when he engages in the business of furnishing surety for hire, his obligation is no longer construed under the *strictissimi juris* rule, but is subject to the rules of construction applicable to insurance policies generally. So that speaking generally, the contracts of suretyship issued by surety companies, organized for the purpose of furnishing surety for hire, such as the defendant, are contracts of insurance. In current decisions dealing with such contracts the courts continually refer to them indifferently as 'bonds,' 'indemnity contracts,' 'insurance bonds,' 'insurance contracts' and 'guaranty policies.' " (Citing cases.) We are inclined to think this bond may be considered as a contract of "fidelity" or "indemnity" insurance as such terms are used in the statute but if not strictly so yet bonds such as we have here "and fidelity and indemnity insurance contracts are *ejusdem generis,* in that they are all species of guaranty insurance" and the bond would be "other insurance" within the meaning of the statute. [State ex rel. Elberta Peach & Land Co. v. Chicago Bonding & Surety Co., supra.]

Vexatious refusal to pay contemplated by the statute "Is not to be deduced from the mere fact that upon suit the verdict is adverse to the defendant." The defendant is allowed, "to entertain an honest difference of opinion as to its liability or as to extent of such liability under the contract of insurance and to litigate that difference." [Non-Royalty Shoe Co. v. Phoenix Assurance Co., 277 Mo. 399, 210 S. W. 37.] The word "vexatiously," as used in the statute, has been defined by the decisions of this court to mean without reasonable, or probable, cause or excuse. [Block v. United States Fidelity & Guaranty Co., 316 Mo. 278, 305, 290 S. W. 429, 441.] "The gist and meaning of the statute . . . is that, when an insurance company has, without reasonable or probable cause or excuse, obstructed a beneficiary by refusing to pay his loss" under its contract "he may be allowed, in his suit thereon, the penalties prescribed." [State ex rel. Gott v. Fidelity & Deposit Co., 317 Mo. 1078, 1095, 298 S. W. 83, 91.] With the foregoing limitations in mind we turn to the instant case. The bond here, confined to its express terms and the sole condition stated therein, merely indemnified the school district against loss or damage to it on account of the failure of the contractor to faithfully perform the contract. The statute relating to bonds of contractors for public work is not referred to, the condition prescribed by that statute in reference to material and labor was entirely omitted nor is the

language of the bond, or the provisions thereof, such, standing alone, to indicate an attempt to comply with the statute or to afford an inference that it was intended to be a statutory bond. We have however followed one line of conflicting authority and held that without regard to the form or wording (the obligation of the statute not being expressly excluded) when a bond is given under the circumstances and in the situation shown in this case the statutory condition will be read into it and the surety held by virtue of the statute, and this holding is not predicated upon a construction of the language or terms of the bond itself. It is doubtful that such rule has heretofore directly and expressly been stated by the appellate courts in this jurisdiction and unless such rule can be deduced from the decision in the Fogarty case it is herein first declared. Respondent, as plaintiff, took the position that the decision of this court in Fogarty v. Davis, supra, determined that the bonding company was liable on this bond for unpaid material accounts and that the refusal of the bonding company to pay same requiring plaintiff to bring this action was therefore vexatious within the meaning of the statute. We have heretofore pointed out the difference of opinion that exists as to our decision in the Fogarty case. The effect of the decision and its applicability as determinative of the surety's liability on a bond such as that involved in this case is a question about which lawyers well might honestly and reasonably differ. [State ex rel. Gott v. Fidelity & Deposit Co., supra.] We have noted that appellant's construction of the Fogarty case is sustained by the United States Circuit Court of Appeals, for this circuit. There was, we think, a debatable legal question involved affording a reasonable basis for defendant surety company's contention herein and we cannot say that its position was not taken in good faith. Accordingly the items of $833.83 as damages and $800 as attorney's fee should be stricken out of the judgment and the cause remanded with directions to enter judgment for plaintiff or relator, as of date of the original judgment, for $8338.35 (this being $7720.70 debt and $617.65 interest thereon to date of judgment), the same to bear interest from date until paid at six per cent per annum. [See State ex rel. Gott v. Fidelity & Deposit Co., supra.] *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.