**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation of the State of Connecticut, Plaintiff,**

v.

**Warren W. LONG, as and for the Building Commission for the William C. Jason Comprehensive High School, et al., Defendants,**

v.

**FARMERS BANK OF the STATE OF DELAWARE, a Delaware Corporation, Third-Party Defendant.**

Court of Chancery of Delaware.

New Castle.

Sept. 5, 1968.

Albert W. James, Arthur J. Sullivan and Edward F. von Wettberg, of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.

Grover C. Brown, Deputy Atty. Gen., Dover, for defendants.

Charles F. Richards, Jr. of Richards, Layton & Finger, Wilmington, for third-party defendant.

DUFFY, Chancellor.

Hartford Accident and Indemnity Company, a Connecticut corporation ("Hartford"), provided surety for Reese W. Smith, a general contractor ("Smith"). It brought this action against the Building Commission for the William C. Jason Comprehensive High School ("Jason Commission"), the Building Commission of the Milford Special School District ("Milford Commission") and the Treasurer of the State of Delaware for moneys due and payable by the State for completion of work under two school building contracts. The State Treasurer filed a counterclaim and third party complaint asking that the Court enter an order directing him to deposit the funds (totalling $131,109.45) retained by the State on the two contracts with the Register in Chancery, and that Farmers Bank of the State of Delaware ("Farmers") be directed to file any claim it may have to the funds. Such an order was entered and Farmers filed a claim for the full amount deposited as an assignee of Smith's rights under the contracts.

Cross motions for summary judgment were filed by Hartford and Farmers and this is the decision thereon.

I

On April 19, 1962 Smith contracted with the Jason Commission for the construction of additions and alterations to its school for a price of $765,042.03. On April 16, 1962 Smith executed a labor and material Payment Bond and a Performance Bond with Hartford as surety; he signed an application for the bonds on April 18, 1962. On December 28, 1962 Smith contracted with the Milford Commission for the construction of additions to the Benjamin Banneker School for a price of $189,000. On that same day, Smith as principal and Hartford as surety executed a labor and material Payment Bond and a Performance Bond for the Banneker School contract. Smith also signed on December 28 an application for the bonds.

The two construction contracts, which have almost identical terms, provide for periodic progress payments and retainages; the former are predicated upon approval by supervising architects and the issuance of a certificate for payment. There are detailed provisions concerning delays, extensions, contract extras, the contractor's obligations to pay for labor and materials, his obligation to deliver a lien-free completed project, rights of termination and the owner's right to withhold payments. Each contract has an assignment clause (Article 33) reading as follows:

"Neither party to the Contract shall assign the Contract or sublet it as a whole without the written consent of the other, nor shall the Contractor assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner."

Each contract (Article 21) allows the Building Commission to complete performance and "deduct the cost thereof from the payment then or thereafter due the Contractor". Both Payment Bonds permit direct suits against Hartford by claimants of Smith who are unpaid for a period of 90 days. Both Performance Bonds permit Hartford to remedy a default by completing the contract or arranging for its completion by another contractor.

In the bond application Smith promised to indemnify Hartford, and assigned to it, and subrogated it to—

" * * * all right and property * * * in, and growing in any manner out of, said contract, * * * or any extensions, modifications, changes or alterations thereof, or additions thereto, and all rights and property * * * in and to all monies, securities, warrants, checks, or other evidences of indebtedness, including but without limiting the

generality of the foregoing, deferred and reserved payments, current and earned estimates, and final payments, that may be due and payable * * * thereunder, * * *."

During the period between October 8, 1962 and September 11, 1963 Smith and his wife borrowed from Farmers various sums of money on demand notes and assigned as collateral amounts due or to become due under the two construction contracts. By letter dated October 18, 1963 Farmers advised the architect for each Commission and the Delaware School Auxiliary Association of assignments by Smith in regard to: (1) invoice No. 5, dated August 13, 1963 in the amount of $47,171.97, in connection with the Banneker School contract; (2) invoice No. 11, dated July 15, 1963 in the amount of $66,743.78, in connection with the Jason School contract; and (3) a 10% retainage ultimately payable in connection with both contracts. The letter stated that amounts payable with respect to those items should be paid to Farmers.

Thereafter the two Building Commissions and the State Treasurer obtained similar information, which was the first time they were informed of the assignment to Farmers. On October 25, 1963 Smith told Hartford about the assignments during a visit to its office in Connecticut where he had gone to request funds to meet his payroll. Hartford thereupon sent representatives to investigate the construction work and shortly thereafter it began financial supervision of the two projects.

On November 6, 1963 Smith requested that available funds be sent to him and to Hartford to pay construction costs on the projects. Two days later Smith opened a "Contract Bond Trust Account" with Wilmington Trust Company as a procedure for the disbursement of funds from five construction contracts, including Jason and Banneker. Checks on the account were to be signed by Smith and countersigned by a Hartford representative. Hartford deposited its own funds in this account and subcontractors and materialmen were paid from it. On November 13, 1963 Hartford and Smith secured a check in the amount of $104,578.17 from the State of Delaware, covering "Invoice No. 11", for work through October, 1963 on the Jason School. Although Smith endorsed the check to Hartford, it was not deposited in the account; Hartford made a series of deposits (totalling the amount of the check) from its own funds and payments were then made for services and materials supplied to the Jason School project. Thereafter Hartford attempted unsuccessfully to obtain a State check in payment of Invoice No. 5 on the Banneker School.

Involuntary bankruptcy proceedings were commenced against Smith and an order of adjudication was issued on January 23, 1964. Between January and March 1964 preliminary and formal letters as to Smith's default on the Jason School contract were sent to Hartford and it was called upon as surety on the Performance Bond to complete performance on the contract. On April 10 the Milford Commission called upon Hartford, as surety, to complete performance of the Banneker contract.

In completing performance on the Jason School contract, Hartford expended $17,-650.80 for labor and materials and paid subcontractors and materialmen $119,239.68 pursuant to its obligations under the Payment Bond, bringing its total out of pocket expenses to $136,890.48. Similarly, on the Banneker School contract it expended a total of $68,770.03, $3,286.83 to complete performance and $65,483.70 pursuant to the Payment Bond. Farmers loaned Smith approximately $171,000, none of which has been repaid. This arithmetic tells the story.

## II

Hartford argues that it is entitled to the funds deposited into court under princi-

ples of equitable subrogation and because 6 Del.C. Ch. 35, impresses a trust on moneys in the hands of an owner for the benefit of a surety who completes performance after default by a contractor. It also relies upon the anti-assignment provisions of the construction contracts.

Farmers, relying upon the assignments which it received from Smith, contends that it has a priority claim to the funds other than retainages.

■ Under the general principle of equitable subrogation a surety which pays the debt of its principal is entitled to the benefit of all remedies which the creditor may have had against the principal. That has long been recognized in Delaware. Hardcastle v. Commercial Bank of Delaware, 1 Har. 374, Note (a) (1831). But the precise question of priority between a surety which completes a construction contract on default of the principal and an assignee of the principal prior to default appears to be raised now for the first time in this State.

■ A surety which completes a construction contract and pays laborers and materialmen after its principal has defaulted is entitled to payments due the principal from the owner. 4 Corbin on Contracts § 901; 17 Am.Jur.2d, Contractor's Bonds § 107; 83 C.J.S. Subrogation § 57; Annots.: 45 A.L.R. 379, 134 A.L.R. 738, 164 A.L.R. 613. In the landmark case of Prairie State National Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896) the Supreme Court held that a surety, who completed performance on a government construction contract after default by the principal contractor, was entitled to a priority in 10% retainages held by the government as against an assignee of the contractor because the surety had a right of subrogation, arising as of the time he entered the contract of suretyship, which matured when he performed under the bond. The assignee (a bank), on the other hand, was not entitled to subrogation since

it loaned money to the contractor, not under compulsion, but as a party which voluntarily entered the transaction after inception. See also Henningsen v. United States Fidelity & G. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908).

Farmers argues that the holding in *Prairie State* applies only to retainages and it concedes that Hartford has the superior claim to them. It is true that *Prairie State* involved only retainages, but the principle is not limited to them. Thus, in Lacy v. Maryland Casualty Co., 32 F.2d 48 (4 Cir. 1929) Judge Parker wrote of *Prairie State:*

"Although that case dealt with rights in a retained percentage, the principles upon which the decision was based support as well the right of the surety to unpaid current estimates."

See also State ex rel. Southern Surety Co. v. Schlesinger, 114 Ohio St. 323, 151 N.E. 177, 45 A.L.R. 371 (1926).

■ Equitable subrogation is here based, not upon the character of the funds or credits withheld or in the hands of the owner but rather upon the nature of the relationship of the parties involved. The initial and primary relationship is between owner and contractor. In the confrontation of parties substituted for them each has only a derived right, which explains its limitations as well as its origin. Thus, an assignee of a contractor takes only that which the contractor can give, and he can give no higher claim against the owner (or the fund) than he himself has. Prairie State National Bank v. United States, supra. On the other hand, the surety, after payment and/or performance, moves into the position of the owner and takes the benefit of all remedies which the owner has against the contractor. And as between owner and contractor, clearly the latter would not have a right to demand a progress payment (even if earned) if labor and materialman remain unpaid or if performance is not completed.

This principle is formulated as follows in 17 Am.Jur.2d, Contractors' Bonds § 112:

"The right of the surety on the bond of a contractor for public work who elects to complete the contract upon the abandonment by the contractor before the completion of the work, to subrogation to the rights of the public body in moneys earned but unpaid at the time of the abandonment of the contract, may be asserted against those who loaned money or furnished material to the contractor before default, taking an assignment as security, or against lien claimants, where such assignment is made or liens are taken without the knowledge or consent of the surety, and where such assignment or liens are not contemplated by the contract or by the surety bond. The contractor cannot, by assignment or otherwise, deprive the surety of his right to the moneys unpaid to the contractor at the time of his abandonment of the contract, so far as necessary to reimburse himself for any losses. The assignee it is said, does not, by reason of the assignment, take greater rights than the contractor himself might have asserted against the public body. One who loans money to a contractor when under no obligation to do so is to be treated as a volunteer, and for that additional reason acquires no right by assignment superior to the right of the contractor himself. The doctrine is generally applied to money already earned as well as money to be earned."

On the narrow question of priority, the order is stated as follows in 83 C.J.S. Subrogation § 59 d.(2):

"The right of the contractor's surety to be subrogated with respect to unpaid funds is usually regarded as superior to the claims of general creditors, the contractor or his receiver or trustee the assignee of funds due under the contract, and various other persons."

In a given case some courts have found in favor of an assignee for equitable reasons. These have included use of the assignee's moneys to help create the retained fund and consent by the surety. Other cases have reached the same result by applying, apparently, the law with regard to conditional assignments. Two of these are relied on here by Farmers: Coon River Co-op Sand Ass'n v. McDougall Construction Co., 215 Iowa 861, 244 N.W. 847 (1932); and North Pacific Bank v. Pierce County, 24 Wash.2d 843, 167 P.2d 454, 164 A.L.R. 602 (1946).

In both of those cases an assignee bank was given priority over an after-paying surety. As to *Coon River*, however, I read that as having turned entirely on the language used in the documents of assignment. The Court said the assignment to the bank was absolute when made, while the assignment to the surety did not become effective until the contractor had abandoned his contract, that is, until he had defaulted. The Court did not discuss nor indeed even refer to the principle of equitable subrogation. But *Northern Pacific* does reflect a point of view different from the prevailing rule. However, the Court did seem impressed by two factors in the case: the assignment to the surety was conditioned on default, while that to the bank was absolute; and prompt notice of the assignment was given by the bank and accepted by the owner.

But whether or not I have correctly read those cases is immaterial because I am satisfied that the general principle of equitable subrogation favoring a surety should be followed in this case. I am so persuaded because it represents the current law in most if not all of the States, it applies a principle recognized in this State as long ago as 1831 in *Hardcastle*, and it produces the more fair and just result. As to the first of these points, the cases and authorities to which I have referred state the law generally. And it is appropriate to note now that some of the recent

decisions specifically reject reliance upon the law of assignment which Farmers contends is found in such decisions as *Coon River* and *Northern Pacific*. Thus, Gray v. Travelers Indemnity Co., 280 F.2d 549 (9 Cir. 1960) and Torrech Nieves v. Maryland Casualty Co., 373 F.2d 510 (1 Cir. 1967) both held that an assignment to a surety was effective as of the date the bond was written and not on the date of default.

On the justice of the matter, Hartford has the more persuasive equity. In principle there is really no difference between retained percentages (to which Farmers' assignments do not run and as to which it does not dispute Hartford's priority) and earned funds which are still in the hands of the State or one of the Building Commissions. When Hartford completed performance of each contract, it did so because it was obligated to do that under the Performance Bond and the Payment Bond. From the dates of those contracts it became bound and from those dates its equity of subrogation arose. By contrast, Farmers was a "volunteer," not in the sense that it failed to give consideration or that it did not have the right to take the assignment; but the Bank freely made "general" loans to Smith without any inquiry of the State, the Building Commissions or Hartford as to the status of the work and existing contractual obligations as the United States Supreme Court asked rhetorically in *Henningsen* about a surety which had paid claims under a payment and performance bond, "Is its equity superior to that of one who simply loaned money to the contractor, to be used by him as he saw fit, either in the performance of his building contract or in any other way? We think it is." And so it is here.

\* \* \*

In view of the conclusion I reach it is not necessary to consider other arguments of the parties. Hartford's motion for summary judgment will be granted, Farmers' will be denied.