**FIRST STATE BANK, a corporation, Plaintiff-Respondent,**

v.

**REORGANIZED SCHOOL DISTRICT R–3, BUNKER, Missouri, and United States Fidelity and Guaranty Company, a corporation, Defendants-Appellants.**

No. 9301.

Missouri Court of Appeals, Springfield District.

May 7, 1973.

Motions for Rehearing or Transfer Denied May 24, 1973 and May 25, 1973.

Dewey Routh, Routh & Turley, Rolla, William E. Seay, Salem, for defendants-appellants.

Weldon W. Moore, Rolla, Morton K. Lange, St. Louis, for plaintiff-respondent.

HOGAN, Judge.

This is an action to determine the priority of claims made by the surety on the performance bond of a defaulting building contractor and a bank which had advanced money on the strength of an assignment of the proceeds of the contract. The trial court has found for the plaintiff bank on stipulated facts and the surety and the school district (which is merely a stakeholder) have appealed. Our duty is to determine whether or not the trial court's judgment represents the proper legal conclusion on the facts stipulated. Jewel Tea Co. v. City of Carthage, 257 Mo. 383, 388, 165 S.W. 743, 744 (1914); Browning v. City of Poplar Bluff, 370 S.W.2d 179, 182 [3] (Mo.App.1963); Bartlett v. Nat'l Fin. Corp., 228 Mo.App. 789, 799, 73 S.W.2d 451, 457 [11] (1934). In reviewing the record, we are permitted to draw reasonable inferences from the facts stated, and we should sustain the judgment if that can be done on any reasonable theory, Murphy v. Doniphan Tel. Co., 347 Mo. 372, 379, 147 S.W.2d 616, 619–620 [6], [7, 8] (1941); Semo Motor Co. v. Nat'l Mut. Ins. Co., 383 S.W.2d 158, 161 [1, 2] (Mo.App.1964), but if the facts stipulated, together with the reasonable inferences to be drawn therefrom, are insufficient to sustain the result reached, the judgment must be reversed, and the case may be remanded for a new trial. City of Stanberry v. Jordan, 145 Mo. 371, 382–383, 46 S.W. 1093, 1096 [5] (1898). By express authority of Rule 83.-13(c) [1] the order for a new trial may be restricted to specific issues.

On November 29, 1967, the school district, specifically Reorganized School District R–3 of Bunker, Missouri, entered into a contract with R. D. Light & Son Construction, Inc., (the contractor) for the construction of an addition to the high school building at Bunker. The contract [2] provides: that the work will be done for the sum of $130,069, and shall be completed by September 26, 1968; that partial or progress payments of 90% of the construction accomplished during the preceding calendar month shall be made on or about the fifth day of each month, on the basis of application for payment submitted by the contractor and certified by the architect, and that on substantial completion of the work, the owner (here the school district) shall pay a sum sufficient to increase the total payments to 90% of the total contract price. The contract further provides that this 10% "retainage", or "retent", as it is often called, shall be paid within 30 days of substantial completion of the work upon issuance of a certificate for payment by the architect. We have the distinct impression that the contract before us (as Exhibit L) is not the whole agreement which the parties entered into; the contract is sufficient as such, but it is written on a standard form prepared for use by the American Institute of Architects, and this form is usually integrated with a second form setting out the general conditions of the contract in detail, including the

---

1. Which was in effect when this appeal was taken. The rule has since been amended and renumbered 84.14. All references to statutes and rules are to RSMo 1969, and Missouri Rules of Court (1973), unless otherwise noted.

2. One of 14 exhibits, of varying length, which were incorporated by reference in the stipulation of facts.

events or conditions of default, and the rights of the parties thereupon. We must, of course, take the record as it comes to us without conjecture as to what may have been omitted, John Hancock Mut. Life Ins. Co. v. Dawson, 278 S.W.2d 57, 61 [9] (Mo.App.1955), and the exhibit included and designated "the contract" must be accepted as such without reference to any document which usually accompanies such contracts.

Contemporaneously with the execution of the contract, the contractor applied to the surety (U. S. F. & G.) for a "performance" bond as required by § 107.170. The application recites that the contractor then had four building contracts "on hand", two of which were partially complete. The amount due the contractor for incomplete work is shown as being $310,561, including the Bunker School contract. By the terms of the application, the contractor conditionally assigned the proceeds of the Bunker job to the surety "as collateral, to secure the obligations [of the contractor]", the assignment to become effective in case of any breach of the agreement contained in the application or in the bond, or in case of any assignment for the benefit of creditors or any application for the appointment of a receiver or trustee for the contractor, whether insolvent or not.

The surety, for a premium not disclosed, thereupon issued a labor and material payment bond (Exhibit K) as mandatorily required by § 107.170, which recites that it is issued simultaneously with a "performance bond" (of the type usually called a "completion" bond), which appears as Exhibit J. For our purposes, we shall regard the contract, the application for the bond, and both bonds as the integrated "contract documents", at least as between the parties, Nat'l Sur. Corp. v. Fisher, 317 S.W.2d 334, 340 (Mo. banc 1958) ; although the contract documents are not as complete as those considered in the *National Surety* case, supra, 317 S.W.2d 334, to which all three parties have referred again and again.

The contractor began work on the school building, apparently in December 1967, and continued working until May 16, 1968, when it entered into a loan transaction with the plaintiff bank. The nature of this transaction is not entirely clear; there are a number of instruments in the record (Exhibits A, B and C) which exemplify or prove some kind of loan agreement, and considering them as a whole, it would appear that the bank agreed to advance the contractor a line of credit up to $56,000, taking as security therefor the contractor's promissory note in the amount of $56,000 and an unconditional assignment of all proceeds to become due under the Bunker School District construction contract. It is stipulated that the loan was made to the contractor as working capital to complete the Bunker School job and other contracts. In any case, the bank filed the assignment, (together with a document entitled a "schedule") for record, and Exhibit B shows that the assignment, together with the "schedule" was recorded in the Phelps County Recorder's Office on May 22, 1968.

The assignment and the note were executed on May 16, 1968. On May 15, 1968, the bank had advised the school district, by letter, that the contractor had applied for a loan, and sought to pledge "their [sic] accounts receivable due from your school district as security." The school district was asked to acknowledge a notice of assignment, prepared, it appears, to comply with the requirements of the federal Assignment of Claims Act, 41 U.S.C. § 15, and 41 C.F.R. 1–30.704, although there is nothing in the record to indicate that federal funds are involved. This formal notice of assignment was acknowledged by a Mr. Edwin R. Miller, as the school district's superintendent, on May 16, and on May 16, notice of the contractor's assignment to the bank was given to the surety's local agent, who had issued and signed the bond on the surety's behalf. The bank's ledger card kept in connection with the contractor's loan shows that the bank advanced the following sums to the contractor: $41,000 on

May 17, 1968; $12,000 on May 29, 1968, and $3,000 on June 17, 1968.

The bank's letter of May 15, 1968, to the school district requested that progress payments be made directly to the bank, but on June 10, 1968, progress payment number six in the amount of $14,561 became due and was paid by the school district to the contractor, who endorsed the school district's check to the bank. On June 21, 1968, the contractor's president conferred with the surety's officers in St. Louis, and met the next day, June 22, with officers of the surety and the bank, at which time the contractor's president declared, in the language of the stipulation, that the contractor "did not have sufficient cash on hand to pay for materials and labor to complete his [sic] then existing contracts."

On July 5, 1968, progress payment number seven in the amount of $12,217.50 became due and payable. On July 16, the bank, through its attorneys, made a formal written demand upon the school district for "all moneys due as progress payment", stating that it was the bank's understanding that progress payment number seven (for work completed during June) was then due and payable. On July 18, the contractor addressed a letter to the surety stating that it was financially unable to complete the Bunker construction and requested the surety "to assist in the completion of the [Bunker] job [so the contractor could] fullfill [sic] its obligations under this contract." On July 19, 1968, the school district drew its check #1607 in the amount of $12,217.50, representing progress payment number seven, in favor of the surety. The check (Exhibit M) shows that it was credited to the surety's account by the Mercantile Trust Company of St. Louis on August 5, 1968. A letter dated July 26, 1968, addressed to the school district's superintendent by Mr. Harry Zumstein, one of the surety's bond attorneys, states that the surety "[has] been advancing funds to assist in meeting payrolls and in the payment of bills owed on the project", and indicates that progress payment number seven was paid by the school district to the surety at the surety's request, and upon the surety's agreement to indemnify the school district in the event of any action by the bank.

Finally, it is stipulated that from and after July 24, 1968, the surety furnished all funds to meet the payroll and discharge the materials bills, and that the surety paid "some" taxes, and on March 1, 1969, took over complete supervision of the work. There is a balance of $28,135.04 due the bank from the contractor.

The trial court made rather detailed findings of fact and conclusions of law. They have been helpful to us, but there is no need to set them forth at length. The court concluded as a matter of law that no default occurred in the performance of the construction contract prior to June 21, 1968, that the plaintiff bank was entitled to both progress payment number seven and the retainage being held by the school district, and entered judgment accordingly.

For the purpose of limiting and defining the scope of this opinion, several preliminary observations are appropriate. In ascertaining the rights of the parties, and determining the priority of their claims, we have found the federal authorities persuasive, not because we believe we are bound by such decisions, but because the federal authorities we have examined involve contracts for public work subject to bonding requirements similar to those imposed by § 107.170. We do not equate a six-director school district with an agency of the federal government, but such school districts are nevertheless public corporations, instrumentalities of the State, and the buildings which they are authorized to construct and maintain are public buildings. Kansas City v. School Dist. of Kansas City, 356 Mo. 364, 369, 201 S.W.2d 930, 933 [4] (1947); School Dist. of Oakland v. School Dist. of Joplin, 340 Mo. 779, 785, 102 S.W.2d 909, 910 [1, 2] (1937). Neither do we say that

§ 107.170[3] is a literal counterpart of the Miller Act, 40 U.S.C. § 270a,[4] but both statutes indicate a strong legislative intent to protect those who furnish labor and materials for public construction, and to assure that they will be paid, Graybar Elec. Co. v. John A. Volpe Constr. Co., 387 F.2d 55, 58[3], [4] (5th Cir. 1967); Camdenton Consol. School Dist. No. 6 of Camden County ex rel. W. H. Powell Lumber Co. v. New York Cas. Co., 340 Mo. 1070, 1077, 104 S.W.2d 319, 322 [1] (1937), and there is, therefore, a certain analogy between this case and the federal cases involving similar disputes, which we shall discuss further.

Two further preliminary observations should be made. As noted, the skeleton contract before us does not specifically state what shall constitute a "default" on the contractor's part, nor define the rights of the parties upon such default. We are therefore obliged to look to such documents as are part of the record, and to general principles of law, to determine the priority of the competing claims of the surety and the plaintiff bank. We do not, either expressly or inferentially, extend our ruling to a holding that the priority of the parties' claims might not be modified by more specific contractual provisions defining the events of default and stating the rights of the parties thereafter.

Finally, though the matter has not been briefed or even mentioned by either party, we have noted that many recent cases involving the priority of claims made by the surety on the performance or labor and materials bond of a defaulting contractor and the contractor's assignee have discussed the effect of Article 9 of the Uniform Commercial Code upon the priority of such competing claims. In our view, the surety's equitable lien, presently to be discussed, has not been affected by the enactment of Article 9 of the Uniform Commercial Code and Article 9 does not govern the priority of the claims here asserted.[5]

On the merits, the parties have briefed and argued a number of points and subpoints and in support of their arguments

---

3. Which as material here reads, "1. It is hereby made the duty of all officials, boards, commissions, commissioners, or agents of the state, or of any county, city, town, township, school, or road district in this state, in making contracts for public works of any kind to be performed for the state, or for such . . . school . . . district, to require every contractor for such work to furnish to the state, or to such . . . school . . . district . . . a bond . . . and such bond . . . shall be conditioned for the payment of [sic] any and all materials . . . consumed or used in connection with the construction of such work . . . and for all labor performed in such work whether by subcontractor or otherwise. "2. All bonds executed and furnished under the provisions of this section shall be deemed to contain the requirements and conditions as herein set out, regardless of whether the same be set forth in said bond, or of any terms or provisions of said bond to the contrary notwithstanding." This section does not, however, purport to limit the public corporation to requiring only a "payment bond". City of St. Louis ex rel. Atlas Plumbing Supply Co. v. Aetna Cas. & Sur. Co., 444 S. W.2d 513, 515–516 (Mo.App.1969).

4. Which in pertinent part reads: "(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, . . . . "(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States. "(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person. . . . "

5. See, as illustrative, In re J. V. Gleason Co., 452 F.2d 1219 (8th Cir. 1971), where the authorities are discussed at length.

have referred us to some fifty-one citations of authority, including textual and encyclopedic statements. While we do not criticize counsel's presentation, the points briefed are interrelated and overlapping, and it would be impossible, in the course of an opinion of reasonable length to discuss and distinguish all the authorities cited, or to consider all the peripheral issues which have been indirectly raised. We shall, therefore, undertake to resolve only those issues which seem to us to be determinative of the appeal, and to consider those only within and subject to the limitations noted above. See Bloomfield Reorganized School Dist. No. R–14 v. Stites, 336 S.W. 2d 95, 97 (Mo.1960); Southwest Eng'r Co. v. Reorganized School Dist. R–9, 434 S. W.2d 743, 746 (Mo.App.1968).

The essential question presented, of course, is which of the two parties is entitled to the fund remaining in the school district's possession. In order to resolve this question we must, unfortunately at the expense of some repetition, consider the rights of the parties as they developed chronologically. We agree with the defendants that the obligations and rights of the contractor, the school district and the surety must be determined in the first instance from the contract itself, the application for the bond, and the bond as executed, inasmuch as the intruments relate to the same transaction, were executed contemporaneously, and the bond was specifically required by § 107.170.[6] By the terms of the contract, the contractor undertook to construct an addition to the Bunker High School building, furnishing labor and materials according to specifications referred to but not set out, the work to be begun not later than December 9, 1967, and to be completed by September 26, 1968. The contractor applied to the surety for a bond on the same day. The application contains an agreement, by the terms of

which the contractor conditionally assigned "all [its] right, title and interest . . . in and to [the contract]", but by its terms this assignment became effective only upon the occurrence of one of several specified events, which need not be set out at length here. Neither the assignment nor the bond itself provides for subrogation upon the principal's default, as did, for example, the bond considered in Bender v. Neillsville Bank of Neillsville, 10 Wis.2d 282, 102 N. W.2d 744, 747 [6] (1960). Therefore, no question of conventional, as distinguished from equitable, subrogation is involved.

The performance bond itself actually consists of two bonds: a) a labor and materials payment bond, as required by § 107.170, and b) a completion bond. The two documents are separate papers, but since the labor and materials bond refers internally to the completion bond, we shall regard the two as a single instrument. While § 107.170 does not in terms require a completion bond, neither does it purport to prescribe the whole of the content of a public works contractor's bond, City of St. Louis ex rel. Atlas Plumbing Supply Co. v. Aetna Cas. & Sur. Co., 444 S.W.2d 513, 515–516 (Mo.App.1969), and we have no doubt that it was within the school district's authority to require a completion bond as an incident to its power to construct and maintain school buildings, see City of St. Louis v. Von Phul, 133 Mo. 561, 567, 34 S.W. 843, 844–845 (1896), and in our opinion, both bonds were binding upon the surety. The labor and materials payment bond is conditioned upon the prompt payment of all who have a direct contract with the principal (or subcontractor) to furnish labor or materials used or reasonably required in the performance of the contract; the completion bond is conditioned upon the prompt and faithful performance of the building contract according to its terms. Such, then, were the gen-

6. Nat'l Sur. Corp. v. Fisher, 317 S.W. 2d 334, 340 (Mo. banc 1958); Noonan v. Independence Indemnity Co., 328 Mo. 706, 715, 41 S.W.2d 162, 165 [6], [7] (1931);

Watson v. O'Neill, 14 Mont. 197, 35 P. 1064, 1065 (1894); 17A C.J.S. Contracts § 298, pp. 128–131 (1963).

eral rights and duties of the parties at the time the contract was executed.

Apparently performance of the work was begun as contemplated in December 1967. Inferably, several progress payments were made directly to the contractor, but by May 16, 1968, the contractor found itself in need of working capital. It applied to the plaintiff bank, which, as we read and construe the several instruments evidencing the loan transaction, agreed to advance the contractor $56,000 as working capital, taking as security the contractor's note and an assignment of all moneys due or to become due under the Bunker construction contract. The bank gave notice to the surety and to the school district. There is no provision in the contract forbidding assignment of the proceeds, we have no general statute forbidding the assignment of claims under public works contracts comparable to 41 U.S.C. § 15, and in our opinion, the assignment to the bank was perfectly lawful. See Gordon v. Jefferson City, 111 Mo.App. 23, 28, 85 S.W. 617, 618 (1905). We do not agree, however, that the contractor's assignment had all the legal effects attributed to it by the bank. Among other things, the bank asserts that the assignment was fraudulent, and that by remaining silent upon notice of the assignment to the bank, the surety permitted the contractor to obtain a loan by misrepresentation, and it further contends that its right to the moneys now in the school district's possession is superior to that of the surety because the money advanced by the bank was used to perform a contractual duty which the surety would otherwise have had to perform under compulsion of its obligation upon the bond.

We do not believe the bank can be heard to say that it advanced funds upon any misrepresentation by the contractor, or that there was any duty upon the surety to object at the time the assignment was made on May 16, 1968. This is not a case like Nat'l Sur. Corp. v. State Nat'l Bank of Frankfort, 454 S.W.2d 354, 357 [3] (Ky. 1970), where the surety agreed to a loan and an assignment of the contract proceeds *after* the contractor was in default. The contractor was in no sense in "default" on May 16. No event had occurred to effectuate the surety's conditional assignment, and there was simply nothing to object to. Neither do we think the bank can be heard to say it was misled to its detriment because the contractor warranted and represented in its assignment to the bank that it had not previously encumbered its right to the proceeds of the Bunker construction contract. In the first place the surety does not claim the funds withheld by the school district by virtue of a prior assignment; further, even though the bank may have had no actual knowledge of the surety's obligation, it must be charged with knowledge that § 107.170 requires contractors constructing public schools to give at least a labor and material payment bond, and with knowledge of the surety's equitable right of subrogation upon the contractor's default.[7] As for the bank's argument that it was equitably a victim rather than a volunteer, and that to allow the surety to recover the funds now retained by the school district would unjustly enrich the surety, the record simply does not support its contention that the proceeds of its loan were used solely to pay for labor performed and materials furnished in the construction of the addition to the Bunker High School, and for no other purpose. Were such the case, then the bank might be entitled to be treated as a supplier of labor and materials, as was the relator in Camdenton Consol. School Dist. No. 6 of Camden County ex rel. W. H. Powell Lumber Co. v. New York Cas. Co., supra, 340 Mo. at 1086–1087, 104 S.

7. Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843, 847, n. 5 (1st Cir. 1969) ; Standard Acc. Ins. Co. v. Federal Nat'l Bank, 112 F.2d 692, 695 (10th Cir. 1940) ; Moran v. Guardian Cas. Co., 64 U.S.App.D.C. 188, 76 F. 2d 438, 439 (1935) ; Maryland Cas. Co. v. Dulaney Lumber Co., 23 F.2d 378, 380 (5th Cir. 1928).

W.2d at 328–29 [5], but here it has been stipulated that the bank's loan was made to provide working capital for the Bunker construction contract and other jobs, and presumably, the money, as advanced, was intended to go into the general account of the contractor to be disbursed in the ordinary course of business. The bank's argument that it has an equity in the whole fund retained superior to *any* equity of the surety is without merit, though we shall discuss the point further.

Another and determinative issue presented is whether the school district had the right to withhold progress payment No. 7 and whether or not, assuming it is entitled to the retainage, or retent by virtue of an equitable lien or equitable right of subrogation, the surety is also entitled to progress payment No. 7. The defendants maintain that the surety is entitled to the whole sum because it was required to complete the contract after the contractor's default; the bank argues that in any case the surety is not entitled to funds earned but unpaid before default, and that progress payment No. 7 was earned before any default occurred. The defendant's position is that default occurred on June 21, 1968, when the contractor advised the surety and the bank's officers that it did not have sufficient cash on hand to pay for materials and labor to complete its then existing contracts; the plaintiff contends that this was not an anticipatory breach or total repudiation which, it says, was necessary to compel the surety to perform.

As we have noted, one of the difficulties presented by this case is that the entire contract does not seem to be before us. The "events of default" usually set forth as part of the contract are missing. Undoubtedly, the contractor's admission that it did not have sufficient cash on hand to pay for the labor and materials to complete its then existing contracts was an admis-

sion of insolvency, for by definition, insolvency, whether of a corporation or a natural person, means inability to pay debts as they become due in the ordinary course of business.[8] There is some authority which seems to hold that a building contractor who admits insolvency is in "default", Bender v. Neillsville Bank of Neillsville, supra, 10 Wis.2d 282, 102 N.W.2d at 747 [4, 5], but there is respectable local authority, never to our knowledge overruled, which indicates that the surety's obligation to perform does not arise until there has been a failure of performance, that is, an actual breach of contract on the contractor's part. County of Audrain ex rel. First Nat'l Bank of Mexico v. Walker, 236 Mo.App. 627, 635, 155 S.W.2d 251, 255 (1941). The bank maintains that the contractor's declaration of insolvency did not amount to a repudiation of the contract, and did not amount to a declaration that it could or would not perform. Since there was no breach of the contract, the bank says, the school district had no right to retain progress payment No. 7.

■ It is true that the prospective inability to perform which arises upon the insolvency of one party to a contract does not necessarily excuse the other party from performance, 6 Corbin, Contracts, § 1261 (1962); 3 Williston, Contracts, § 880 (rev. ed. 1936), and see Cornett v. Best, 151 Mo.App. 546, 551–552, 132 S.W. 35, 36 [2] [3] (1910), but it may justify the solvent party in requiring security as a condition to further performance. 6 Corbin, Contracts, § 1261, p. 41; Restatement of Contracts § 287 (1932). Nevertheless, even given the school district's equitable obligation to see that the lawful claims of laborers and materialmen are satisfied, a matter we shall discuss further, we do not believe the record is sufficient to establish the school district's right to withhold progress payment No. 7. If, at the time progress payment No. 7 became due on July 5, there

8. Adams v. Richardson, 337 S.W.2d 911, 916 [6] (Mo.1960); May v. Gibler, 319 Mo. 672, 677, 4 S.W.2d 769, 771 [2] (1928); Bushman v. Bushman, 311 Mo. 551, 564, 279 S.W. 122, 126 [10] (1925).

were outstanding, unpaid bills for labor and materials, then the school district was justified in withholding the progress payment due in order to satisfy those claims, or to assure that they were satisfied, Nat'l Sur. Corp. v. United States, 133 F.Supp. 381, 383–384 [2–4], 132 Ct.Cl. 724 (1955), cert. denied sub nom. First Nat'l Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955), but there is nothing in the stipulation to show that any laborers or materialmen remained unpaid on July 5. Neither is there anything to show the surety's right to claim progress payment No. 7 because it had become obligated by the terms of its bond to pay, and had paid, outstanding labor and materials claims prior to the date progress payment No. 7 was earned. If it is the fact that prior to July 5, 1968, the surety paid labor and materials claims because it was obligated to do so under its bond, then we would agree that it was performing the contract as surely as if it had undertaken completion of the job, and would, as we shall presently note, be entitled to recover all moneys now in the hands of the school district, but all we know from the stipulated facts is that the surety, on July 26, stated that "at the *request* [of the principal] we have been advancing funds to assist in meeting payrolls and in the payment of bills owed . . . in an effort [to] avoid disruption of work". As stated in the *County of Audrain* case, supra, 236 Mo. App. at 635, 155 S.W.2d at 255, the surety was under no compulsion to perform upon its bond until there was an actual failure of performance on the part of the contractor. For all the record shows, progress payment No. 7 was fully earned before the surety paid out a single dollar it was obligated to pay. The surety's right to be subrogated remained only potential until it

satisfied an obligation it was required to satisfy, and as the record stands, neither the school district's right to withhold progress payment No. 7 nor the surety's right to claim that payment is established. Nat'l Union Fire Ins. Co. of Pittsburgh v. United States, 304 F.2d 465, 467–468, 157 Ct.Cl. 696 (1962). Cf. United Pacific Ins. Co. v. United Sates, 362 F.2d 805, 808–810 [3], 176 Ct.Cl. 176 (1966).

Finally, we must consider the surety's argument that in the circumstances, it is entitled to all the funds retained by the school district because of its payment of all the labor and materials bills from and after July 24, 1968, and its assumption of complete supervision of the work on March 1, 1969. The surety asserts that it has an equitable right of subrogation to or an equitable lien upon the funds now held by the school district; the bank counters with the argument that the surety stands in the shoes of the contractor, and can have no greater claim than it would have, and in any case its assignment was superior to any assignment made to the surety.

■ We shall not attempt to discuss the law further than is necessary to dispose of the appeal. The general rule is that a surety which executes a performance bond on a construction contract, and is thereafter required to pay unpaid labor and materials claims, or to complete the contract upon default by the contractor, has an equitable right of subrogation and an equitable lien upon funds retained by the owner or obligee; this right of subrogation or equitable lien is superior to the right of one who takes by assignment from the contractor after the execution of the bond, and relates back to the date of the surety's bond.[9] Moreover, the bank is mis-

9. Nat'l Sur. Corp. v. Fisher, supra n. 6, 317 S.W.2d at 341–342; Indiana Truck Co. v. Standard Acc. Ins. Co., 232 Mo. App. 63, 75–76, 89 S.W.2d 97, 104 [5] (1936); Annots. 164 A.L.R. 613 (1946); 134 A.L.R. 738 (1941); 45 A.L.R. 379 (1926). For a discussion of the surety's

rights upon a public works contractor's default, particularly as developed in the federal cases, see Note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, 71 Yale L.J. 1274 (1962), which carries the discussion up to but not including Pearlman v. Reliance

taken in saying that upon default the surety is subrogated only to the rights of the contractor; as a matter of general law, it is now the prevailing view that upon default of a public works contractor, the surety is subrogated to the rights of the obligee as well as those of the principal,[10] and its right of subrogation or equitable lien extends to *all* funds, earned but unpaid progress payments, as well as contract retainages, in the hands of the contractee at the time of default.[11] In this case, we are particularly concerned with the subrogative right of the surety which satisfies the unpaid claims of laborers and materialmen. The rational basis of this subrogative right, and the reasons for its priority over the competing claims of assignees, trustees in bankruptcy and others has been variously put,[12] but we need not, for our purposes, discuss the various legal theories advanced as a basis for the surety's priority.[13] Whatever may be the true legal foundation of the surety's priority, all that is necessary for the surety's lien to attach and for the surety to prevail is that the contractor be in default as a matter of fact, and that as a result of such default the surety become obligated to pay under its payment bond, and discharge the obligations of its principal. Thereupon, the surety's right of subrogation relates back to the date of the execution of the bond. Fidelity and Deposit Co. of Maryland v. United States, 393 F.2d 834, 836–837 [1–3], 183 Ct.Cl. 908 (1968), and see Henningsen v. United States Fidelity & G. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), and Nat'l Surety Corp. v. United States, supra, 133 F.Supp. at 383–385 [1] [2–4] [5], cert. denied sub nom. First Nat'l Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793. The argument is still occasionally advanced that allowing the surety priority unjustly enriches the surety to the extent that the proceeds of a loan are used to discharge an obligation the surety would otherwise bear, which seems to have been the reason for allowing the relator to recover on its assignment in the *Camdenton Consolidated School District* case, supra, 340 Mo. at 1086–1087, 104 S. W.2d at 328–329, and see Town of River Junction v. Maryland Cas. Co., 133 F.2d 57, 59 [6, 7] (5th Cir. 1943), but more recent cases seem to reject the proposition that the assignee's equity should be held superior to that of the surety even when the funds loaned upon assignment have been used to reduce the surety's obligation.

Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) ; for a further discussion of the general law as it relates to public works contracts, see United States F. & G. Co. v. First State Bank of Salina, 208 Kan. 738, 494 P.2d 1149, 1152–1155 (1972).

10. Industrial Bank of Washington v. United States, 138 U.S.App.D.C. 19, 424 F.2d 932, 934–935 [3] (1970) ; Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., supra n. 7, 411 F.2d at 845, 848 [1] ; Home Indemnity Co. v. United States, 313 F.Supp. 212, 214–215 [4] (W.D.Mo.1970) ; Continental Cas. Co. v. United States, 169 F.Supp. 945, 946–947, 145 Ct.Cl. 99 (1959) ; Hartford Accident and Indemnity Co. v. Long, 245 A.2d 800, 803 [2] [4] (Del.Ch.1968) ; United States F. & G. Co. v. First State Bank of Salina, supra n. 9, 208 Kan. 738, 494 P.2d at 1154–1155.

11. Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., supra n. 7, 411 F.2d

at 848, and authorities cited n. 9 ; Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 321 (5th Cir. 1967) ; Mass. Bonding & Ins. Co. v. State of N. Y., 259 F 2d 33, 37 [3] (2d Cir. 1958) ; Standard Acc. Ins. Co. v. Federal Nat'l Bank, supra n. 7, 112 F.2d at 694–695 [4] ; Reliance Ins. Co. v. Alaska State Housing Auth., 323 F.Supp. 1370, 1372– 1373 [3] (D.Alaska 1971).

12. See Continental Cas. Co. v. United States, supra n. 10, 169 F.Supp. at 946– 947 ; Nat'l Sur. Corp. v. United States, 133 F.Supp. 381, 383–385 [1] [2–4] [5] [6], 132 Ct.Cl. 724 (1955), cert. denied sub nom. First Nat'l Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955), both cited with approval in Pearlman v. Reliance Ins. Co., supra n. 9, 371 U.S. at 141, n. 23, 83 S.Ct. at 237, n. 23, 9 L.Ed.2d at 196, n. 23.

13. For such a discussion, see Note, supra n. 9, 71 Yale L.J. at 1280–1293.

Fidelity and Deposit Co. of Maryland v. United States, supra, 393 F.2d at 837 [4]. As a matter of general law, however, there are two limiting factors which are significant in this case. First, the surety's subrogative right remains potential until the contractor is actually in default and the surety becomes obligated to pay and does pay the obligations of its principal, Fidelity and Deposit Co. of Maryland v. United States, supra, 393 F.2d at 837; American Cas. Co. of Reading, Pa. v. Line Materials Indus., 332 F.2d 393, 395 [3, 4] (10th Cir. 1964); Nat'l Union Fire Ins. Co. of Pittsburgh v. United States, supra, 304 F.2d at 468; and further, the language of the definitive cases, e. g., Pearlman v. Reliance Ins. Co., 371 U.S. 132, 141–142, 83 S.Ct. 232, 237, 9 L.Ed.2d 190, 196 (1962), and Continental Cas. Co. v. United States, 169 F. Supp. 945, 947, 145 Ct.Cl. 99 (1959), is that the surety may recover no more than the amount necessary to reimburse it, and is entitled to judgment for the whole amount retained by the contractee only if it has paid out more than the amount of the retained fund.

We have neither the authority nor the inclination to say that the general principles just stated are or should be the law of this state, but upon examination of the applicable precedents cited to us, we do not find the law as declared by our courts to be very different in any material respect from the law as declared by the federal cases. The parties have cited the *National Surety* case, supra, 317 S.W.2d 334, many times; both the bank and the surety maintain that it supports their positions. We agree that that opinion is a most articulate and scholarly discussion of the general principles there involved, but in sum, at least as we read the case, the court merely held in the circumstances that unconditional payment of an earned sum to the contractor before default freed that sum of any equitable lien on the part of the intervening surety as against the plaintiff surety, which had a prior, valid claim against the contractor as a completing surety on

another bond. Our case is not so complicated, and in any event, many of the authorities we have considered and discussed are there cited as stating the general law. As previously noted, the *Camdenton School District* case, supra, is easily distinguishable from the present case, because it is stipulated here that the money advanced by the bank went to furnish working capital for several construction projects, whereas in the *Camdenton School District* case, the funds advanced by the relator had been used to pay for labor and materials which went into the school building. The *Camdenton School District* case does not, perhaps, jibe with the latest federal decisions, but it has nevertheless been argued, with some merit, that when the assignee's loan has been made to discharge an obligation the payment bond surety would have had to bear, and has been used for that purpose, but the surety is nevertheless held subrogated to the entire retained fund, the surety is unjustly enriched. See Town of River Junction v. Maryland Cas. Co., supra, 133 F.2d at 59 [6, 7]; Royal Indemnity Co. v. United States, 93 F.Supp. 891, 899–900, 117 Ct.Cl. 736 (1950) (dissenting opinion).

As for the other Missouri cases cited by the parties, the *County of Audrain* case, supra, or at least the principal opinion, simply holds, as we read it, that a completing surety's right of subrogation cannot arise until the contractor has defaulted. The holding in School Dist. No. 18 of Caruthersville v. McClure, 224 S.W. 831 (Mo. 1920), though somewhat obscure as to the relative priorities between the lending bank and the surety, recognizes the right of the owner to apply sums in its hands to the unsatisfied claims of laborers and materialmen. In our view it is clearly distinguishable from the case at hand a) because it was shown that the proceeds of the loan went directly to pay for labor and materials used in the construction of the school, which is not true here; and b) the surety had covenanted to repay what the obligee might expend in payment for labor and

materials, a covenant which is not found expressly or by fair implication in any of the documents before us on this appeal. Certainly the case is no authority for the proposition that the bank's assignment should prevail over the surety's right of subrogation. As the respondent bank contends, Mass. Bonding & Ins. Co. v. Ripley County Bank, 208 Mo.App. 560, 237 S.W. 182 (1921), affirms the surety's right to be subrogated to the retent *after* default, and runs parallel with the general law as we understand it, but it does not reach the question of priority of claims to earned but unpaid progress payments, and is not fully decisive of all the questions presented here.

We reiterate our conclusion that the principles developed in the federal cases involving public works contracts are applicable here. The federal cases, from the *Henningsen* case, decided in 1908, through the *Pearlman* case, decided in 1962, lay heavy emphasis upon the equitable obligation of the government or governmental unit to see that those who supply labor or materials for the construction of public buildings are paid. They also emphasize that public buildings are nonlienable, and that the Miller Act, 40 U.S.C. § 270a et seq., and its predecessor, the Heard Act, 28 Stat. 278 (1894), as amended 33 Stat. 811 (1905), were passed by the Congress to afford special legislative protection for those who furnish labor and materials for the construction of public buildings. Graybar Elec. Co. v. John A. Volpe Constr. Co., supra, 387 F.2d at 58 [3] [4]; note, supra, 71 Yale L.J. at 1276–1277, and n. 18. In Missouri, as long ago as 1896, in City of St. Louis v. Von Phul, supra, 133 Mo. 561, 34 S.W. 843, our Supreme Court emphasized the duty of public corporations to protect the interests of those who furnish labor and materials for the construction of public improvements; as early as 1883, it had noted such an obligation on the part of school boards. Board of President and Directors of the St. Louis Public Schools v. Woods, 77 Mo. 197, 201–202 (1883). In

1895, the General Assembly enacted a statute requiring every public works contractor to execute a labor and materials payment bond, Laws of Mo.1895, p. 240. In 1959, Laws of Mo.1959, S.B.No.294, § 1, the General Assembly provided that all performance bonds for public works would be deemed to contain a labor and materials payment condition, whether or not the bond actually contained such a provision. Moreover, our courts have indicated that if the directors of a school district fail to require a labor and materials payment bond, they can be held personally liable to laborers and materialmen who go unpaid upon the contractor's default. Rupard Asphalt Co. v. O'Dell, 382 S.W.2d 832, 834 [1, 2] (Mo.App.1964); Burton Machinery Co. v. Ruth, 194 Mo.App. 194, 199–200, 186 S.W. 737, 738–739 (1916). Without pursuing the matter further, we think the public policy underlying the federal cases is reflected in the Missouri cases and in the legislative history and purpose of § 107.170.

In light of these principles, we summarize our opinion and holding as follows:

■ 1. The surety, upon the contractor's default, became subrogated to the rights of the contractor and the school district, and has an equity in the retained fund superior to that of the bank. The surety's rights relate back to the time of the execution of the bond.

2. It is not clear when the surety's right of subrogation attached; it is entitled to recover progress payment No. 7 only if the condition of its payment bond had been breached prior to the time progress payment No. 7 became due on July 5, 1968.

■ 3. We consider it a reasonable inference that the surety would not advance all funds needed for completion of the contract without being obligated to do so by the terms of its bond; therefore, we hold the surety entitled to all sums earned

but unpaid from and after July 5, 1968, including the retent in the amount of $6,297.-54.

4. The surety is entitled to recover progress payment No. 7 in the amount of $12,217.50, provided: its labor and materials payment bond was breached before that estimate became due and payable on July 5, 1968, and provided the total amount expended by the surety exceeds the amount here in controversy, to-wit $18,515.04.

The judgment is therefore reversed and remanded for further proceedings not inconsistent with this opinion. The parties may stipulate further or the court may hear such evidence as will enable it to enter a final judgment in accordance with this opinion, but only on the following issues: 1) the date of the contractor's actual default under the labor and material payment bond, and 2) the total amount expended by the defendant surety. It is so ordered.

TITUS, C. J., and STONE, J., concur.

BILLINGS, J., not participating because not a member of the court when the cause was submitted.

## ON MOTION FOR REHEARING OR TO TRANSFER

### PER CURIAM:

In its alternative motion for rehearing or for transfer to the Supreme Court, the plaintiff bank asserts, among other things: 1) that it should not be charged with notice that a "completion" bond existed, because § 107.170 requires only a labor and materials payment bond; and 2) that, to quote plaintiffs' motion, "the resolution of this case depends upon whether it is fair to give the surety's right of equitable subro-

gation priority over the bank's assignment . . . when the bank gave the surety notice of the assignment . . . and the surety remained silent." The plaintiff suggests that the surety should be required to give any subsequent assignee who gives notice some indication that there is a bond and that the surety will have an equitable right of subrogation after default. Such contentions, in point of fact, were considered and rejected by the courts whose decisions we cited in the principal opinion, but perhaps we should state our position more explicitly.

Plaintiffs' argument that it cannot reasonably be held to constructive notice of the existence of a "completion" bond, as distinguished from a "payment" bond draws a distinction without a difference, for the surety's subrogative right is essentially the same whether it performs as a "completing" surety or as a "payment" surety. Moreover, statutory provisions requiring some kind of bond from a public works contractor are usual, not exceptional, 64 Am.Jur.2d Public Works and Contracts § 99, pp. 961–962 (1972), and the rule charging the assignee of a public works contractor with constructive knowledge of such statutory provisions has been applied as a matter of state law, as well as federal law. See Standard Acc. Ins. Co. v. Federal Nat. Bank, supra, 112 F.2d 692, 695 (10th Cir. 1940) (applying Oklahoma law); Derby v. United States F. & G. Co., 87 Or. 34, 169 P. 500, 503 [3] (1917).

As for the plaintiffs' argument that the surety should be required to notify the contractor's assignee of its equitable right of subrogation, we might suggest, as most courts have, that the bank was certainly under no compulsion to loan the contractor any money, and might easily have protected itself by making inquiry of the arrangements between the contractor and the surety, since it knew of the surety's existence. However, we wish to emphasize

that the surety's right of equitable subrogation does *not* arise out of the assignment contained in the application for the bond, even though the plaintiff persists in regarding this case as a case involving two competing assignments. The surety's right of subrogation arises independently of contract by operation of law under familiar principles of equity. Pearlman v. Reliance Ins. Co., supra, 371 U.S. at 136, n. 12, 83 S.Ct. at 235, n. 12, 9 L. Ed.2d at 193 n. 12; Standard Acc. Ins. Co. v. Federal Nat. Bank, supra, 112 F.2d at 695. As for the bank's argument that the general rule affording the surety a right to the retained fund superior to that of the assignee (with the exceptions noted in the principal opinion) is inherently "unfair", and should be reexamined, we again note that we did not purport in the principal opinion to establish a general rule of law applicable to all public works contracts in this state. However, our Supreme Court, in Nat'l Sur. Corp. v. Fisher, supra, 317 S.W.2d at 341, acknowledged the general rule that a surety which executes a performance bond on a construction contract, and which thereafter is required to pay labor or material claims, has an equitable right of subrogation and an equitable lien on funds retained by the owner or obligee which is superior to the right of one who takes by assignment from the contractor after the execution of the bond, and the bank's argument that it has, or should be held to have, an inherently superior status, has been rejected again and again by the courts, generally on grounds of public policy. See again Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843, 845 (1st Cir. 1969); United States F. & G. Co. v. First State Bank of Salina, 208 Kan. 738, 494 P.2d 1149, 1154–1155 [1] (1972); note, supra, 71 Yale L.J. at 1278–1280. We see no reason for reexamination of the existing law in the circumstances of this case.

The alternative motion for rehearing or for transfer is denied.