**CITY OF KANSAS CITY, MISSOURI ex rel., and for the Use and Benefit of, LAFARGE NORTH AMERICA INC., and Quicksilver 2005, LLC, Appellants,**

v.

**ACE PIPE CLEANING, INC. and Travelers Casualty and Surety Company of America, Respondents.**

No. WD 73044.

Missouri Court of Appeals, Western District.

July 26, 2011.

Application for Transfer to Supreme Court Denied Aug. 30, 2011.

Application for Transfer Denied Oct. 25, 2011.

---

Jennifer A. Bierman, Robert B. Preston, St. Louis, MO, Scott R. Ast, Kansas City, MO, for appellants.

David A. Schatz, Albert S. Laferte, Derek T. Teeter, Kansas City, MO, for respondents.

Before Division Two: THOMAS H. NEWTON, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge. ·

Plaintiffs/Appellants Lafarge North America Inc. and QuickSilver 2005, LLC appeal the trial court's judgment denying them the right to recover against statutory payment bonds issued to a general contractor on public works projects in the City of Kansas City. We affirm.

### Factual Background

The facts of this case present a relatively straight-forward legal issue. Under Missouri's Little Miller Act, can a supplier to a sub-subcontractor recover against a statutory payment bond obtained by a general contractor on a public works project? The answer is no.

The City of Kansas City ("City") hired a general contractor, Ace Pipe Cleaning, Inc. ("Ace") to construct, repair and replace five municipal sewer facilities. As required by Section 107.170,[1] also known as the Little Miller Act, Ace purchased a statutory payment bond from Travelers Casualty and Surety Company of America ("Travelers") for each of the projects.[2]

Ace entered into a subcontract with U.S. Constructall, Inc. ("US Constructall") on four of the five projects (the "USC Projects"). US Constructall was owned by Henok Woldermariam and Daniel Hlavna ("Daniel")[3], and operated by Daniel. Ace authorized U.S. Constructall to subcontract certain trucking work to Excel Trucking, Inc. ("Excel"), a company fully owned and operated by Andi Hlavna ("Andi"), Daniel's wife.[4] US Constructall also subcontracted its obligation to provide concrete for the USC Projects to Excel, although it did so without a written subcontract and without Ace's knowledge. Excel then contracted with Lafarge[5] North America Inc. ("Lafarge")[6] to supply the concrete for the USC Projects. Lafarge did not ask Excel if it had a direct subcontract with Ace to provide the concrete for the USC Projects.

On the fifth project known as the "Phase J Project" Ace subcontracted directly with Excel for the provision of concrete. Excel also contracted with Lafarge to supply the concrete for the Phase J Project.

Excel failed to pay Lafarge for the concrete it supplied for the USC Projects and the Phase J Project in the total amount of $127,887.50. Lafarge filed suit against U.S. Constructall and Excel for this amount, and also filed claims against Ace

---

1. All statutory references are to RSMo 2000, as updated through the 2010 cumulative supplement, unless otherwise indicated.

2. The Little Miller Act applies only to public works projects which are not subject to mechanic's liens.

3. Due to the fact Daniel Hlavna and his wife Andi Hlavna are both involved in this litigation, we have used their first names. No familiarity or disrespect is intended.

4. One reason Excel was involved as a subcontractor was to satisfy a minority contractor requirement. Excel was certified by the City

as a Woman Owned Business Enterprise ("WBE").

5. The trial court, respondents and appellants seem to disagree on the proper capitalization of "Lafarge." As Lafarge itself in its petition, brief and other materials refers to the company as "Lafarge" and not "LaFarge," we will adopt Lafarge's interpretation of its own name.

6. This action is brought on behalf of Lafarge North America Inc. and its affiliate QuickSilver 2005, LLC, collectively referred to as "Lafarge."

and Travelers on the statutory payment bonds for this amount.

The trial court entered judgment in favor of Lafarge and against U.S. Constructall and Excel in the amount of $127,887.50 on a theory of breach of contract.[7] Of this, $32,916.61 was attributable to the Phase J Project and $94,960.89 was attributable to the USC Projects.

The trial court entered judgment in the amount of $32,916.61 in favor of Lafarge and against Ace and Travelers on the statutory payment bond for the Phase J Project, finding that Ace was the general contractor, Excel was Ace's subcontractor, and Lafarge was Excel's supplier, and thus not too remote from Ace to recover on the statutory payment bond for that project.[8]

The trial court entered judgment in favor of Ace and Travelers and against Lafarge with respect to the claims asserted against the statutory payment bonds on the USC Projects. The trial court found that Ace was the general contractor, U.S. Constructall was Ace's subcontractor, Excel was a sub-subcontractor to U.S. Constructall, and Lafarge was a supplier to Excel. The trial court found that Lafarge was too remote from Ace to permit recovery on the statutory payment bonds on the USC Projects given the construction of the Little Miller Act in *City of St. Louis ex rel. Stone Creek Brick Co. v. Kaplan–McGowan Co.*, 233 Mo.App. 789, 108 S.W.2d 987 (1937).

At trial, Lafarge attempted to circumvent *Stone Creek*'s construction of the Little Miller Act, which limits recovery on statutory payment bonds to first tier subcontractors and those contracting directly with them. First, Lafarge argued that a theory known as "telescoping" should apply to collapse U.S. Constructall and Excel into one entity, rendering Lafarge a supplier of materials to a first tier subcontractor. The trial court held that the theory of telescoping, which looks at the substance of the relationship between parties as opposed to their technical form, is consistent with the purpose underlying the Little Miller Act. However, the trial court concluded that the facts of the case did not warrant the application of the theory of telescoping in part "because no party in this lawsuit participated in a sham or is in any way culpable, and because Ace was not unjustly enriched."

Second, Lafarge argued that U.S. Constructall and Excel were not separate entities and that the court should pierce the corporate veil to treat them as one. The trial court found that U.S. Constructall and Excel were indeed separate entities, and that U.S. Constructall did not exercise dominance and control over Excel. As a result, the trial court held that the "piercing the corporate veil doctrine is inapplicable to U.S. Constructall and Excel."

Accordingly, the trial court refused to find that Lafarge was an eligible claimant

**7.** As we discuss, *infra,* the trial court found U.S. Constructall and Excel to be separate corporations to which the doctrine of piercing the corporate veil should not apply. The trial court also found that Excel was a subcontractor of U.S. Constructall on the USC Projects. No one contests that U.S. Constructall was not involved on the Phase J Project. The trial court's entry of a joint and several judgment for breach of contract against U.S. Constructall and Excel on all five of the projects is not consistent with these findings. This apparent inconsistency was explained at oral argument as attributable to the fact that neither U.S. Constructall nor Excel actively defended Lafarge's lawsuit. Regardless the explanation, neither U.S. Constructall nor Excel has appealed the trial court's entry of a joint and several judgment against them.

**8.** The judgments entered in connection with the Phase J Project are not at issue in this appeal.

on the statutory payment bonds on the USC Projects.

Lafarge filed this timely appeal.

## Standard of Review

 In reviewing a court-tried case, we are governed by the familiar standards of *Murphy v. Carron.*[9] This court "will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *R.L. Polk & Co. v. Mo. Dept. of Rev.*, 309 S.W.3d 881, 884 (Mo. App. W.D.2010). Questions of law, including issues of statutory interpretation, are reviewed de novo. *Motor Control Specialities, Inc. v. Labor and Indus. Relations Comm'n*, 323 S.W.3d 843, 849 (Mo.App. W.D.2010). We review all evidence in a light most favorable to the judgment and disregard all evidence and inferences to the contrary. *Dhyne v. State Farm Fire and Cas. Co.*, 188 S.W.3d 454, 456–457 (Mo.2006).

## Analysis

Lafarge raises two points on appeal. First, Lafarge contends that the trial court erred by concluding that in order to telescope the subcontract between U.S. Constructall and Excel, it was necessary to show the existence of a sham designed to insulate Ace from liability on the payment bond or that Ace was unjustly enriched. Second, Lafarge contends that *Stone Creek* should be disregarded, and the Little Miller Act should be construed to afford protection to any supplier or laborer who would otherwise be entitled to protection under Missouri's mechanic's lien laws.

Lafarge has not appealed the trial court's determination that the doctrine of piercing the corporate veil does not apply to U.S. Constructall and Excel. Nor has Lafarge contested the sufficiency of the evidence to support any of the trial court's factual findings as set forth in its judgment.

For ease of analysis, we will address Lafarge's points on appeal in reverse order.

## Point Two

In its second point on appeal, Lafarge claims the trial court erred in denying Lafarge's bond claims because, notwithstanding *Stone Creek*, the Little Miller Act should be construed to afford protection to all laborers and materialmen performing work on a public works project. In support of this argument, Lafarge notes that: (1) the plain language of the Little Miller Act does not limit the tiers of eligible claimants on a statutory payment bond; and (2) public policy dictates construing the Little Miller Act *in pari materia* with Missouri's mechanic's lien laws to protect all laborers and materialmen who improve public property. We disagree.

 In Missouri, as is the case federally and in most states, public property is protected from mechanic's liens. *Collins & Hermann, Inc. v. TM2 Const. Co., Inc.*, 263 S.W.3d 793, 797 (Mo.App. E.D.2008). The Little Miller Act, like the Federal Miller Act, requires general contractors to obtain statutory payment bonds for certain public projects. Section 107.170.2. Statutory payment bonds shift the ultimate risk of nonpayment from workman and suppliers to the surety on public work projects.[10] *City of St. Louis ex rel. Stone Creek Brick*

9. 536 S.W.2d 30, 32 (Mo. banc 1976).

10. However, if a surety is required to pay a claim on a statutory payment bond, the surety is entitled to seek recovery from the general contractor, rendering the general contractor the ultimately liable party.

*Co. v. Kaplan–McGowan Co.*, 233 Mo.App. 789, 108 S.W.2d 987, 989 (1937). Since public property cannot be encumbered by a mechanic's lien, the Little Miller Act also serves to promote public works projects by offering laborers and materialmen some assurance of payment. *Collins*, 263 S.W.3d at 797.

The relevant provisions of the Little Miller Act read as follows:

> It is hereby made the duty of all public entities in this state, in making contracts for public works, the cost of which is estimated to exceed twenty-five thousand dollars, to be performed for the public entity, to require every contractor for such work to furnish to the public entity, a bond with good and sufficient sureties, in an amount fixed by the public entity, and such bond, among other conditions, shall be conditioned for the payment of any and all materials, incorporated, consumed or used in connection with the construction of such work, and all insurance premiums, both for compensation, and for all other kinds of insurance, said work, and for all labor performed in such work *whether by subcontractor or otherwise*.

Section 107.170.2 (emphasis added). Lafarge contends the phrase "whether by subcontractor or otherwise" should be construed to cover all laborers or materialmen on a public works project, no matter how far removed from the general contractor.

■ The same question was presented to the Court of Appeals in 1937 in *Stone Creek*. In *Stone Creek*, the court addressed the legislature's intended meaning of the phrase "whether by subcontractor or otherwise" as the court considered whether a supplier of bricks to a sub-subcontractor of a first tier subcontractor could recover against a statutory payment bond. 108 S.W.2d at 988–89. As in the case before us, the sub-subcontractor in *Stone Creek* had been fully paid but failed to pay the supplier. *Id.* at 989. The court held that "the phrase 'or otherwise,' . . . though at first blush apparently calculated to be all-inclusive as to those who furnish labor or material for the work, is actually not so, but . . . comprehends only those laborers or materialmen who furnish labor or material to a subcontractor." *Id.* at 990. Thus, the court interpreted the Little Miller Act to restrict recovery against statutory payment bonds to subcontractors and to providers of labor or materials to subcontractors.

The Court in *Stone Creek* reasoned that the *"actual* test" is one of privity of contract. *Id.* In the court's view:

> When the principal contractor and his surety execute their bond they know that certain portions of the work either will or may be let out to subcontractors, and, if so, that it will or may be necessary for certain materialmen and laborers to furnish material and perform labor in the prosecution of those portions of the work thus sublet. Consequently it follows that one who furnishes material on the job or performs labor on the job for a subcontractor is in privity of contract and within the protection of the bond, in that he furnishes his material or performs his labor at the instance of the subcontractor, who is of course in direct privity with the principal contractor.

*Id.* at 991. The court concluded, however, that this is where "privity of contract" ends,[11] and that:

<hr>

11. Of course, true legal privity of contract does not exist between a general contractor and the supplier of materials to a subcontractor as they are not parties to the same contract. *See* BLACK'S LAW DICTIONARY 1237 (8th ed.2004). However, this court has adopted the legal fiction that because a subcontractor is in privity with the general contractor, sup-

[O]ne who supplies material to a materialman, who in turn supplies the subcontractor, is to be relegated to the status of stranger to the original contract, since such person's contract or undertaking is neither with the principal contractor, nor with one who, as in the case of a subcontractor, deals directly with the principal contractor. Such person's contract is therefore but indirect and collateral to the original contract, and for want of privity does not serve to bring such party within the purview of the principal contractor's bond.

*Id.*

Lafarge argues that *Stone Creek* should not be followed. First, Lafarge argues that the plain language of the Little Miller Act does not limit the tiers eligible to recover on a public works bond. However, this was precisely the argument advanced and rejected in *Stone Creek.* In the seventy four years since *Stone Creek,* not a single Missouri case has distinguished *Stone Creek,* or questioned its attribution of legislative intent to the phrase "whether by subcontractor or otherwise." Lafarge offers no compelling reason for us to disregard the settled precedent of *Stone Creek.*

Second, Lafarge argues that the Little Miller Act should not be construed to permit recovery by a narrower class than would be permitted under Missouri's mechanic's lien laws as to do so is inconsistent with the Act's purpose to protect those who improve public property. This argument is but a mere recast of Lafarge's first argument, as it would also require us to conclude that *Stone Creek* mistakenly determined the legislature's intent with respect to the class of eligible claimants on a statutory payment bond.

We are not persuaded by the premise underlying Lafarge's argument. Had the legislature intended the scope of claimants eligible to recover under a statutory payment bond obtained as required by the Little Miller Act to be co-extensive with the class of eligible claimants under Missouri's mechanic's lien laws, it could either have expressly so stated in the Little Miller Act, or it could have elected to permit mechanic's lien rights to be asserted against public property. It did neither, and instead employed language of a limiting nature when describing the class of eligible claimants under a Little Miller Act bond.

It is true that Missouri cases have routinely recognized that one of the purposes of the Little Miller Act "has long been to afford to those furnishing labor or material on public work the same measure of protection as is afforded by the mechanic's lien law where the building or improvement is not of a public character." *Collins,* 263 S.W.3d at 798, (citing *Camdenton Consol. School Dist. No. 6 of Camden County ex rel. W.H. Powell Lumber Co. v. New York Cas. Co.,* 340 Mo. 1070, 104 S.W.2d 319, 322 (Mo. banc 1937); *Stone Creek,* 108 S.W.2d at 989; *City of St. Louis v. Hill–O'Meara Const. Co.,* 175 Mo.App. 555, 158 S.W. 98, 100 (Mo.1913)). However, this general principle is not self proving of Lafarge's contention that anyone who would be eligible to recover under the mechanic's lien laws must also be eligible to assert a claim on a statutory payment bond. It is enough to observe that *Stone Creek* limited the scope of eligible claimants on a statutory payment bond notwithstanding its observation that:

pliers or sub-subcontractors to the subcontractor are also in privity with the general contractor for purposes of determining eligibility to recover against a statutory payment

bond issued pursuant to the Little Miller Act. *See City of St. Louis v. Hill–O'Meara Const. Co.,* 175 Mo.App. 555, 158 S.W. 98, 101 (1913).

the purpose of requiring a bond in connection with a contract for the erection of a public building was to afford those persons furnishing labor and material on public work, which cannot be subjected to mechanic's lien, the same measure of protection as is afforded by the mechanic's lien law in those cases where the building or improvement is not of a public character.

There is no dispute that a materialman or laborer can assert and enforce a mechanic's lien in Missouri even if more remote from the original contractor than the tier of sub-subcontractor. *See Fruin–Bambrick Constr. Co. v. Jones,* 60 Mo.App. 1, 7–9 (Mo.App.1894); Mo BAR, II Mo. CONSTRUCTION LAW ch. 9 (2nd ed.2004). There are practical explanations, however, for permitting a larger class of mechanic's lien claimants than Little Miller Act statutory payment bond claimants.

The class of permitted claimants on a statutory payment bond, subcontractors and first tier sub-subcontractors, covers the vast majority of persons or entities supplying materials and labor for a public works project. As noted in *Stone Creek,* a general contractor is in a reasonable position to oversee and control those with whom its subcontractors have subcontracted, and thus to foresee (and address) the risk of nonpayment at these tiers in order to control exposure on a statutory payment bond.[12] 108 S.W.2d at 991. It strains logic, however, to conclude that a general contractor can reasonably foresee or discern tiers of materialmen and laborers beyond the first tier of sub-subcontractors. *Id.* Exposing sureties who issue statutory payment bonds to unlimited exposure for layer upon layer of materialmen and laborers on a public works project would topple

seventy-four years of established practice in the industry, and would have the commensurate effect of reducing the availability of bonds, or of driving up the general contractor's cost to procure a statutory payment bond. Neither scenario promotes public works projects—one of the recognized objectives of the Little Miller Act. *Collins,* 263 S.W.3d at 797; *Johnson Controls, Inc. v. Citizens Memorial Hosp. Dist.,* 952 S.W.2d 791, 793 (Mo.App. S.D. 1997) (holding that one purpose of Little Miller Act is to facilitate construction of public works).

In contrast, although a broader class of lien claimants is permitted under Missouri's mechanic's lien laws, those laws impose strict conditions on the right to file and enforce a mechanic's lien including notice requirements, constraints on the form of a mechanic's lien, limits on the nature of work eligible for mechanic's lien protection, limited time frames for filing and/or seeking to foreclose a mechanic's lien, and the defense of payment for certain property owners. *See* Sections 429.010 through 429.360. These statutory constraints effectively operate to limit mechanic's lien protection, and are not constraints imposed on those otherwise eligible to assert claims against a statutory payment bond.

There is an even more compelling difference between statutory payment bonds and mechanic's liens. Bonds by their nature define a risk, and charge the purchaser of the bond a premium based on that calculated risk—an exercise that is greatly influenced by the prospective scope of eligible claimants against the bond. The anticipated cost of a statutory payment bond is thus included within a general contractor's bid, and is indirectly paid by the owner as a part of the contract price. On

---

**12.** It is ultimately the general contractor who is at risk. Though claims made against a statutory payment bond are technically assert-ed against the surety issuing the bond, the surety invariably looks to the general contractor for repayment.

public works projects subject to the Little Miller Act, the "owner" of the property is "any official, board, commission or agency of this state, any county, city, town, township, school, road district or other political subdivisions of this state." Section 107.170.1(2). It follows that taxpayers are directly impacted by the cost of statutory payment bonds, such that unlimited risk on statutory payment bonds will translate into a higher cost to perform essential public works projects. In contrast, mechanic's liens are enforced against the real estate improved by the unpaid work on the theory that the value of the property has been enhanced by the value of the work performed. Thus, there is no "front end" cost added to the contract price associated with protecting against the risk of mechanic's liens.[13]

We conclude, therefore, that the similarity between mechanic's lien laws and the Little Miller Act ends with the objective of both schemes to afford protection to unpaid materialmen and laborers, albeit as limited by the respective legislative schemes. Beyond that, the Little Miller Act and mechanic's lien laws are disparate by necessity and by design.[14] Any doubt we may have about this conclusion is erased by the fact that the Missouri Legislature has accepted *Stone Creek*'s construction of the Little Miller Act for seventy-four years. The Legislature has not amended the Little Miller Act to reflect an intent to permit a broader scope of eligible bond claimants than recognized in *Stone Creek*, although other portions of the Act have been amended subsequent to *Stone Creek*. *See* Section 107.170 (RSMo Cum. Supp.1993; RSMo 1994; RSMo Supp.1995; RSMo Cum.Supp.1997).

Lafarge does not quarrel with the fact that it knew, given the established state of the law, that it would not be protected by the statutory payment bonds on the USC Projects if it was a supplier to a tier beyond a subcontractor. Lafarge concedes that it did not inquire into Excel's relationship with Ace on the USC Projects. Lafarge was in the best position to control its risk by assuring itself, before agreeing to supply concrete to the USC Projects, that it was an eligible claimant on the statutory payment bonds.[15] Point Two is denied.

### Point One

In its first point on appeal, Lafarge argues the trial court erred in denying La-

---

13. We acknowledge that private construction projects (particularly large commercial projects) often incorporate a requirement that the general contractor purchase a payment and/or performance bond to insure the owner against the risk of nonpayment and/or a failure to perform, an obligation the general contractor may "pass on" by requiring subcontractors to bond their work. These private bonds are not to the exclusion of mechanic's lien rights, however, and are not statutorily required. They instead represent the calculated choice of a private property owner to increase the cost of a construction project by the cost of such a bond in an effort to reduce the risk that the property could later be subject to mechanic's lien claims.

14. Missouri is not alone in its incongruent treatment of mechanic's lien claimants and statutory payment bond claimants. Many states impose the same restrictions on the recovery against statutory bonds for public works as those imposed in *Stone Creek*. *See, e.g., Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Const. Co., Inc.*, 246 Kan. 557, 792 P.2d 1043, 1048 (1990); *B. Sweetser Const. Co. v. Newman Bros., Inc.*, 236 Ark. 939, 371 S.W.2d 515, 517 (1963).

15. The trial court found, for example, that although Excel was authorized to acquire concrete from Lafarge on credit, its credit limit was $5,000.00. Had Lafarge taken reasonable steps to learn that it would be unable to assert a claim against the statutory payment bonds on the USC Projects, it could have refused to sell Excel concrete on credit over and above this established credit limit.

farge's claims because (1) the relationship between U.S. Constructall and Excel should be "telescoped," making Lafarge a supplier to a subcontractor, because Excel was merely a straw man used by U.S. Constructall to purchase concrete for the USC Projects from Lafarge on credit; and (2) in order to "telescope" the relationship between U.S. Constructall and Excel, it was not necessary to show the presence of a sham designed to insulate Ace from liability on the statutory payment bond or that Ace was unjustly enriched.

At trial, Lafarge argued that a theory called "telescoping," which it claims has been used by federal courts in applying the Federal Miller Act, should be adopted in Missouri. Telescoping essentially looks to the substance of contractual relations between the parties rather than the form. *See Fine v. Travelers Indem. Co.*, 233 F.Supp. 672, 681–82 (W.D.Mo.1964). If the substance of a relationship warrants, then a tier in the contract chain is collapsed, moving all parties beneath that tier up a level in the chain of contractual privity. *See id.* The theory of "telescoping" has neither been adopted nor discussed by any reported Missouri decision addressing the Little Miller Act.

The trial court found that the theory of telescoping is not inconsistent with the policy underlying the Little Miller Act, and thus tacitly supported adoption of the theory by Missouri courts. Lafarge obviously agrees with the trial court's conclusion. Neither Ace nor Travelers contests the trial court's conclusion. However, because no Missouri appellate court has heretofore explored the viability of "telescoping" as applied to the Little Miller Act, we are compelled to review this conclusion of law *de novo. Murphy*, 536 S.W.2d at 32.

Lafarge directs us to four federal decisions addressing the concept of telescoping. In *Fine*, 233 F.Supp. 672, the plain-tiff supplied materials and/or labor to W.S. Connor. *Id.* at 675. The defendant claimed Connor was a sub-subcontractor to Sterling Brukar, which was itself a subcontractor to S.S. Silerblatt, the general contractor. *Id.* Sterling Brukar and S.S. Silerblatt had an unwritten agreement to route certain moneys through the corporate books of Sterling Brukar on the project, even though Sterling Brukar "had no money or risk in the 'contract' it allegedly 'negotiated.'" *Id.* at 682. Sterling Brukar and S.S. Silerblatt were family corporations controlled by the same president. *Id.* The court found that:

[T]he Silerblatt organization knew from the outset that Connor could not possibly perform on his own financial ability and the agreement between them accurately reflected that fact. Even on paper, Sterling Brukar, Inc. was to be the banker for the work that was to be performed by Connor, although the other facts clearly establish that Sterling Brukar, Inc. was acting only as a shadow for S.S. Silerblatt, Inc., in making that financial commitment. S.S. Silerblatt, Inc., through its president, knew exactly who was financially responsible from the outset and defendant bonding company, of course, is presumed to have had that same knowledge.

*Id.* Given these facts, the court concluded that the relationship between S.S. Silerblatt and Sterling Brukar, and the relationship between Sterling Brukar and Connor, should be "telescoped" or collapsed, avoiding the artificial creation of separate contracting tiers. *Id.*

In *Glens Falls Insurance Co. v. Newton Lumber & Manufacturing Co.*, 388 F.2d 66 (10th Cir.1967), DMH Enterprises, Inc. ("DMH") entered into a contract with the United States Air Force to build base housing. *Id.* at 67. Before DMH bid on the project, its President, Darrell Hills

("Hills"), collaborated with Earl Campbell, d/b/a Construction Industries of Colorado ("Campbell") about bidding the project, with a pre-existing understanding about the part Campbell would play should the bid be awarded to DMH. *Id.* Hills and Campbell were married to sisters and were close friends. *Id.* After signing its general contract with the Air Force, DMH entered into a written subcontract with Campbell for the carpentry and millwork on the project. *Id.* Campbell then entered into a subcontract with Whiteside Construction ("Whiteside"). Whiteside agreed to furnish and perform "virtually all of the materials, labor and work which Campbell undertook to furnish under his purported subcontract with DMH." *Id.* Virtually all of the negotiations with respect to the Campbell/Whiteside contract were handled by Hills, the President of DMH. *Id.* at 68.

One of the bond claimants in the case, Perfection Truss Co. ("Perfection"), submitted a bid to Hills to provide roof trusses for the project. *Id.* at 69. Hills advised Perfection that its contract would be with Whiteside. *Id.* Another bond claimant in the case, Newton Lumber and Manufacturing, Co., ("Newton") was told by Hills that Whiteside was the framing subcontractor on the project. Campbell's "subcontract" was not mentioned to either supplier. *Id.*

The court affirmed the trial court's factual findings, which were:

> That the contract between DMH and Campbell was a sham; that Campbell permitted the use of his name in the contract with Whiteside Construction for the benefit of DMH; that there was no intent to impose a contractual obligation on Campbell ...; that the purpose of using Campbell's name in the contract ... purporting to be a subcontract between Campbell and Whiteside Construction, and the contract ... purport-

ing to be a subcontract between DMH and Campbell, was to make it appear that Campbell was a subcontractor of DMH and Whiteside Construction a subcontractor of Campbell, and thereby insulate DMH from liability to materialmen for materials furnished to Whiteside Construction for the housing project, and that Campbell's relationship with DMH was that of agent or employee.

*Id.* Given these facts, the court held that it was proper to regard substance over form to conclude that Whiteside was a subcontractor of DMH, not Campbell. *Id.* "Otherwise, the purpose of the remedial statute [the Miller Act], to protect suppliers of materials to the actual subcontractors of the prime contractor, could be defeated by setting up by formal contract a straw man as a subcontractor between the prime contractor and one who in substance and intent is the actual subcontractor." *Id.* at 69–70.

In *United States ex rel. Hillsdale Rock Co. v. Cortelyou & Cole, Inc.*, 581 F.2d 239 (9th Cir.1978), the Atomic Energy Commission ("AEC") entered into a contract with Stanford University, which anticipated that Stanford would hire a contractor (Cortelyou) to do construction work on a nuclear accelerator lab. *Id.* at 240. Cortelyou was required by the contract to obtain a bond for the project. The Court held that for purposes of the Miller Act, Cortelyou (not Stanford) was the general contractor because it had obtained the bond and Stanford was merely acting as an agent of the AEC. *Id.* at 241.

In *United States ex rel. M.A. Bruder & Sons, Inc. v. Aetna Casualty & Surety Co.*, 480 F.Supp. 659 (D.D.C.1979), the plaintiff directly negotiated, worked with, and delivered materials to the subcontractor, Alt. *Id.* at 662. Alt instructed the plaintiff to send its bill to a third party, Kenneth

Sales ("Sales"), in care of Alt at Alt's office in Arlington, Virginia. *Id.* The one payment received by the plaintiff was from Alt and not the purported sub-subcontractor. *Id.* In this circumstance, the court held that the plaintiff had in fact entered into a contract with the subcontractor and not Sales, an entity set up by Alt for internal billing purposes. *Id.* The court found on these facts that Sales was not really a subcontractor on the project. *Id.*

These cases reveal that telescoping is not a novel theory requiring either adoption or rejection by Missouri courts. In fact, we observe that the word "telescoping" is used in only one of the four cases discussed above. *Fine*, 233 F.Supp. at 682. Rather, these cases stand for the simple, common sense proposition that trial courts will necessarily engage in a fact-driven determination to assess whether a person or entity designated as a "subcontractor" on a public works project protected by a statutory payment bond is, in fact, a subcontractor. Our conclusion is verified by the court's recognition in *Fine* that "to understand what the Miller Act meant when it made reference to a 'subcontractor,'" courts should employ the meaning of "that word that had acquired, 'by usage in the building trades,' a specific and 'more technical meaning' than the broad, generic meaning that could generally be ascribed it." 223 F.Supp. at 679, (quoting *Clifford F. MacEvoy Co. v. U.S. for Use and Benefit of Calvin Tomkins Co.*, 322 U.S. 102, 108, 64 S.Ct. 890, 88 L.Ed. 1163 (1944)).

■ Thus, we conclude that the trial court did not err by recognizing that the concept of "telescoping" is consistent with the policy underpinning the Little Miller Act. However, there is no talismanic significance to the term "telescoped." We do not and need not assign the term "telescoping" to the common sense factual inquiry a trial court must conduct when de-

termining the number of tiers separating the general contractor and a claimant on a statutory lien bond under the Little Miller Act. To make this determination, a trial court will be required to determine whether persons assigned the label of "subcontractor" on a project are, in fact, a "subcontractor," employing the definition of the term customary to the construction industry. As this determination is, of its very nature, a factual one, we will review the trial court's factual finding that Excel was a subcontractor to U.S. Constructall on the USC Projects with appropriate deference to insure that it is supported by substantial evidence and is not against the weight of the evidence. *Murphy*, 536 S.W.2d at 32.

■ The trial court found that Excel was, indeed, a legitimate subcontractor to U.S. Constructall on the USC Projects. Lafarge has not contested the sufficiency of the evidence to support this finding. The customary definition of "subcontractor" in the construction industry is "[o]ne who takes [a] portion of a contract from [the] principal contractor or another subcontractor. . . . One who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance." BLACK'S LAW DICTIONARY 1424 (6th ed.1990); *see also Fine*, 233 F.Supp. at 681–82 (holding that under the Federal Miller Act, a "subcontractor" is defined as a party that "take[s] from and perform[s] a specific part of the labor or material requirements of the original contract in a manner consistent with the established usage in the construction industry.") (citing *Clifford F. MacEvoy Co.*, 322 U.S. at 109–110, 64 S.Ct. 890). Lafarge concedes that it dealt directly with Excel in connection with Excel's requests that it provide concrete to the USC Projects. Lafarge performed as requested by Excel.

Lafarge sent its invoices for payment to Excel. Lafarge looked to Excel for payment. The scope of U.S. Constructall's subcontract with Ace was broader than the provision of concrete flatwork for the USC Projects. In fact, the trial court found that U.S. Constructall was expressly authorized by Ace to subcontract out trucking work to Excel in order to afford the projects required minority contractor participation. Though U.S. Constructall did not secure Ace's authority to subcontract the obligation to acquire concrete for the USC Projects to Excel, that fact alone does not negate that Excel took over U.S. Constructall's responsibility to provide the concrete. All of these facts are consistent with the industry definition of "subcontractor."

Lafarge latches on to the trial court's additional factual findings that "no party in this lawsuit participated in a sham," and that "Ace was not unjustly enriched" to contend that the trial court erroneously concluded that one of these factors had to exist before the trial court could have found that Excel was not a subcontractor. We do not read the trial court's factual findings so rigidly. Rather, the trial court's findings about the absence of a sham or of unjust enrichment were collectively considered with other relevant facts as the trial court evaluated Excel's role on the USC Projects. We will assign no error to the trial court's consideration of the intent of the parties in involving Excel on the USC Projects, as the intent of the parties is one of many facts relevant to a trial court's inquiry about whether someone is a subcontractor.

Lafarge also seizes upon the trial court's factual finding that Excel acted as a "straw man" for U.S. Constructall. Lafarge argues that this finding is singularly dispositive of the trial court's obligation to collapse U.S. Constructall and Excel into a single tier. We disagree. Just as it would have been improper for the trial court to require a finding of unjust enrichment or an intent to commit a sham as a condition of finding that Excel was not a subcontractor, so it would be improper to conclude that merely because Excel was a "straw man," the trial court was obligated to conclude that Excel was not a subcontractor. That is particularly so given the trial court's corollary finding that although Excel was a straw man for U.S. Constructall, "there is no evidence it was done to insulate anyone from liability or to block claims on the bond, but rather to permit the purchase of concrete from Lafarge on credit."[16] It is evident that the trial court did not believe that Excel was a straw man for an illicit or improper purpose. We agree with this conclusion. The mere fact that U.S. Constructall took advantage of Excel's credit arrangement with Lafarge is not facially nefarious nor dispositive.[17] The evidence indicated Excel was established as a separate and distinct entity two years before the USC Projects. Excel had been certified by the City as a Woman Owned Business Enterprise, and was found by the trial court to have been included as a participant on the projects to

16. We note that in the sentence of the judgment finding that Excel was a straw man to U.S. Constructall, the trial generally stated that "Excel provided no labor or material on the project," a statement that is incongruent with the trial court's specific factual findings that (a) Excel was a subcontractor to U.S. Constructall, (b) Excel contracted with Lafarge to supply concrete on the USC Projects, and (c) "Ace authorized U.S. Constructall to further subcontract certain trucking work to Excel." It is also incongruent with Lafarge's concession that Excel did, in fact, make all of the arrangements necessary to secure concrete from Lafarge for the USC Projects.

17. The evidence indicated that U.S. Constructall lost its credit line with Lafarge due to payment issues.

take advantage of this designation. Excel was indisputably a subcontractor on the Phase J Project where U.S. Constructall was not a participant, requiring one to question how Excel could be a legitimate subcontractor on that project, but not on the USC Projects. Subcontracting the acquisition of concrete to Excel to take advantage of Excel's credit relationship with Lafarge is not inherently inconsistent with treating Excel as a subcontractor, particularly in light of the substantial evidence herein described suggesting that Excel's activities on the USC Projects were consistent with the industry definition of "subcontractor."

Moreover, we observe the irony of Lafarge's emphasis on U.S. Constructall's use of Excel's credit line with Lafarge. The evidence established that Excel's credit line with Lafarge was only $5,000.00, far less than the $94,960.89 in concrete Lafarge permitted Excel to purchase on credit for the USC Projects. Lafarge offered no evidence to suggest that U.S. Constructall or Excel could have anticipated that Lafarge intended to permit Excel to acquire more than $5,000.00 of concrete on credit.

In light of the foregoing, we conclude that the trial court's finding that Excel was a subcontractor on the USC Projects, and thus its finding that the facts did not warrant collapsing the relationship between USC Constructall and Excel as to render Lafarge an eligible claimant on the statutory payment bonds on the USC Projects,

are supported by substantial evidence and are not against the weight of the evidence.

In the alternative to the "telescoping" theory, Lafarge argued at trial that the doctrine of piercing the corporate veil should apply to collapse the relationship of U.S. Constructall and Excel. After evaluating the eleven factors identified in *Real Estate Investors Four, Inc. v. American Design Group, Inc.*, 46 S.W.3d 51, 56–7 (Mo.App. E.D.2001), the trial court disagreed. Lafarge has not appealed this conclusion. We thus need not further discuss the doctrine of piercing the corporate veil other than to observe a similarity between determining whether an entity is a subcontractor under the Little Miller Act and determining whether corporate veils should be pierced. Both determinations require a trial court to review the relevant facts and circumstances of each case, with no requirement that any particular fact or set of facts be present (or absent) as a condition of the determination.[18]

Point One is denied.

### Conclusion

We conclude that Excel was a subcontractor to U.S. Constructall, and that Lafarge was a supplier to Excel. Lafarge was too far removed from the general contractor, Ace, to be an eligible claimant on the statutory payment bonds obtained for the USC Projects under the Little Miller Act. *See Stone Creek*, 108 S.W.2d at 990. The judgment of the trial court in favor of Ace and Travelers rejecting Lafarge's claim against the statutory pay-

---

**18.** It should be obvious from our discussion that if a trial court concludes that the doctrine of piercing the corporate veil applies, the effect would be to collapse the involved entities into one tier for purposes of calculating eligible claimants on a statutory payment bond. *See, e.g., Ragan v. Tri–County Excavating, Inc.*, 62 F.3d 501, 510 (3d Cir.1995); *U.S. for Use and benefit of Global Bldg. Supply,*

*Inc. v. WNH Ltd. P'ship*, 995 F.2d 515, 519 (4th Cir.1993) (holding sureties may be reached "where ordinary principles of corporate law permit the courts to disregard corporate forms"). However, a trial court could conclude that an entity was not a subcontractor consistent with industry definition without concluding that the doctrine of piercing the corporate veil applies.

ment bonds on the USC Projects is affirmed.

All concur.